**TRICE v. UNITED STATES.**
**No. 13732.**

United States Court of Appeals, Ninth Circuit.

March 2, 1954.

Rehearing Denied June 11, 1954.

**514**

Morris Lavine, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Ray H. Kinnison, Asst. U. S. Atty., Chief Criminal Division, Mark P. Robinson, Asst. U. S. Atty., Los Angeles, Cal., and Edward J. Skelly, Jr., Asst. U. S. Atty., North Hollywood, Cal., for appellee.

Before STEPHENS, ORR and POPE, Circuit Judges.

STEPHENS, Circuit Judge.

Alfred F. Trice was charged in an indictment with four violations of the narcotic laws. He pleaded not guilty to each and after trial by jury he was found guilty as to each count. Trice was charged in Count One with selling and distributing on or about June 4, 1952, a certain narcotic drug (approximately forty grains of heroin) named in Title 26 U.S.C.A. § 2550(a) and being in violation of Title 26 U.S.C.A. § 2553(a). Trice was charged in Count Two with knowingly and unlawfully receiving, concealing, and facilitating transportation on or about June 4, 1952, of the drug the subject matter of Count One, Title 21 U.S.C.A. § 174. In Count Three Trice was charged with selling and distributing on or about June 17, 1952, ninety-eight grains of heroin. Trice was charged in Count Four with transporting on or about June 17, 1952, the subject matter of Count Three.

The court pronounced sentence of imprisonment for five years and a fine of $2,000 on each of Counts One, Two, and Three, "and that the defendant be further imprisoned until said fines aggregating $6,000 be paid or he is otherwise discharged as provided by law." The periods of imprisonment as to Counts One, Two, and Three are to commence and run concurrently. On Count Four the court sentenced Trice to five years' imprisonment and a fine of $2,000, but provided that imposition of sentence is suspended and probation is granted for a period of five years commencing upon defendant's release from custody follow-

ing "execution" of the sentences imposed under Counts One, Two, and Three, and during the probation period he shall pay a fine of $2,000.

Trice has appealed from the judgment, claiming the right of a reversal thereof upon four specifications of error.

It is not claimed that appellant did not receive, distribute, sell, conceal, and facilitate the transportation of the narcotics as alleged in the indictment, but he claims that he was entrapped; that hearsay evidence was received in regard to a Federal Bureau of Narcotics file; that the information in the Federal Bureau of Narcotics file was too remote; that appellant was denied a fair trial guaranteed by the Fifth Amendment of the United States Constitution.

Appellant, a Los Angeles resident for forty-seven years, operated a liquor store in that city. He was quite well acquainted with a J. T. Gipson, a drug addict, who also was suffering from tuberculosis. Gipson or "J. T.", as he was commonly called, was rather widely suspected as a person having something to do with trade in narcotics. About the time the events of this case began to happen, J. T. was hospitalized. On May 29, 1952, a government narcotic agent named Malcolm P. Richards, who represented himself as being "Dick Williams", called upon Trice at the latter's store and engaged him in talk about an article in a newspaper. "Williams" represented himself as being a friend of J. T.'s. On June 3, 1952, Agent Richards called at the store and handed Trice a note which J. T. had sent to Trice from Olive View Tuberculosis Sanitarium. Trice asked how Gipson (J. T.) was, to which "Williams" replied, "Fine". "Williams" told Trice that he had "$40.00 to spend for some stuff". The money was paid over and "Williams" returned the next day and the "stuff", which was forty grains of heroin, was delivered to him by Trice who requested "Williams" to say "Hello" to Gipson. The delivery of the heroin upon this occasion is the basis for the charge in Count One of the indictment

as to the sale, etc. of narcotics, and as to the charge in the Count Two as to its transportation, etc.

"Williams" (Agent Richards) testified that he had not read the note but he understood it said that the bearer was a friend named Dick Williams who had some money to spend for narcotics. Gipson at the time was an employed stool pigeon working with "Williams", and he had told "Williams" that he had been in prison. "Williams'" approach to Trice through the note was by representation that he and Gipson had been friends in New York and that he, "Williams", was going to go into the haberdashery business, all of which was untrue. There is much testimony from Trice that "Williams" painted Gipson as suffering great pain and that no one was helping him, and that the doctor in the sanitarium would not give him narcotics. This "Williams" denies, but he admits that Gipson was in pain and that he told Trice Gipson was sick and up at the sanitarium, and later that he, "Williams", was instrumental in getting Gipson released from the sanitarium. There was some visitation by and between Williams, Gipson, Trice, and others between June 3 and June 16, 1952. During this time Gipson was sick and Trice testified that he begged for narcotics. "Williams" testified that on June 16, 1952, he went to the liquor store and said to Trice that he had about $250 "to spend for some stuff" and Trice said he couldn't do anything about it but for about $325 "he might be able to give me ("Williams") a good bargain". "Williams" called the next day and after going about to a drug store, Trice delivered another package containing ninety-eight grains of heroin, to "Williams". "Williams" testified that he never delivered any narcotics to Gipson. The sale of the ninety-eight grains of heroin on June 17, 1952, is the basis of Count Three of the indictment, and its transportation is the basis of Count Four.

Gipson died shortly after the 17th of June, 1952.

Entrapment.

In the first place, the people's fight through the government against the use of narcotics is a desperate and continuous one. So great is the menace that the hiring of disreputable persons to act with the narcotic agents in deceit and by despicable methods to catch distributors of the "stuff" has been sanctioned by the highest courts as the only successful manner to combat the evil. The picture from its best side (the government's) is a sorry one.

■ Here we have a government agent using a consumptive narcotic exconvict of ill repute to double-cross a friend. Here is entrapment in fact, at least as to the first and second counts. The question is: Is it illegal entrapment and the answer to that question is to be found in the testimony of the narcotic agents on whether they had reasonable grounds to believe that Trice was predisposed to engage in the illicit traffic.

Mr. George R. Davis, an agent of the Bureau of Narcotics with offices in Los Angeles, California, was called by government counsel in rebuttal as a witness to show that the officers had reasonable ground for doing what they did. At or near the outset of the trial the government counsel, outside the jury's presence, had informed the court that he would make such a showing. Government Counsel Robinson stated:

"* * * The defense that has been raised is entrapment, and I think the cases are clear that the Government has the right where the defense of entrapment is raised to bring out through competent evidence the information, even hearsay, that they have concerning the defendant in order that they dispel any possible doubt as to whether they merely went out and tried to capture an innocent person."

After some unimportant colloquy, the court stated:

"As I understand it, under the issue as to entrapment, the defend-ant presents that issue and you may show not only information which the Government officials had which led them to believe that he was supposed to have committed the offense, but you may also show anything you have about his past record or his past doings or his past propensities which would tend to meet the issue whether or not he was a man predisposed to violation of law.

"Mr. Robinson: That is correct, your Honor. That is our understanding. * * *

"The Court: Do you have any different view from that, Mr. Broady?

"Mr. Broady [Defense Counsel]: No, your Honor, no different view from that."

When Agent Davis was recalled as a witness by the government in rebuttal, he testified that the Bureau of Narcotics keeps records, and that in the records is a file of Alfred F. Trice. The first date in the file concerning narcotics is April 10, 1943. Davis received information as to the first entry from one John F. Baber, an ex-convict. Defense counsel inquired whether the information from Mr. Davis was to go to prove the truthfulness of the information. Government counsel replied in the negative, that he wanted the information to go to the jury on the question of whether the officers had acted upon reasonable grounds. Defense counsel stated:

"If it is not offered to the truthfulness, your Honor, there is no objection."

Agent Davis further testified as follows:

"In 1942, when I first arrived in Los Angeles from transfer from the East, I said I had heard of Al Trice at that time as supplying opium, smoking opium, to various persons in the Los Angeles and the San Francisco area. I do not recall at the time who told me that, whether it was another agent or an inform-

er. I believe, however, that was one of the agents who was then stationed in this office.

"I next heard of Al Trice in 1943 or 1944, upon my return to Los Angeles from Phoenix, Arizona. At that time Trice was under investigation by our office by, I believe, Agents Marcy and Carpenter. I did not know how extensive the investigation was, because I heard them talk about it. I saw the reports in the file. There was indication that he was associated with an employee of the Matson Line who was bringing in opium to Los Angeles; that Al Trice in turn carried it to San Francisco.

"We had reports from another law enforcement agency that various highjackers posing as state narcotic inspectors had stopped Mr. Trice on at least two or three occasions on the way to San Francisco when they had information that he was carrying opium to that city.

" * * * [T]hen in May of this year I talked to J. T. Gipson. He mentioned, among other persons, Al Trice as being a source of supply for narcotics. * * *."

"After that conversation during which Trice's name was mentioned, I communicated with the district supervisor, who in turn communicated with the headquarters of the Bureau in Washington. Thereafter Agent Malcolm Richards [alias "Dick Williams"] was transferred to this district with the specific purpose of working with Mr. Gipson on the various suspects who had been mentioned by him.

"Before the arrival of Mr. Richards, who had been delayed, I talked approximately four times with J. T. Gipson. I knew that Mr. Gipson was familiar with a great number of suspects in Los Angeles through his work and through the fact that he had become addicted to the use of narcotics. There was no secret about that in any part of town so far as I know. * * *

"Upon Agent Richards' arrival he [Richards] was introduced to J. T. Gipson. Thereafter together they went to various suspects, among whom was Al Trice. * * *

"The Court: Did Gipson tell you anything about the activities of Trice in connection with narcotics?

"The Witness: Yes, sir. * * * He told me, as I stated before, that Al Trice was engaged in the selling of narcotics.

"Q. By Mr. Robinson: Did he say what kind of narcotics?

"A. He said he could buy heroin from him.

"Q. Did he say anything about Trice's source of supply or anything like that?

"A. No. He was asked that. I asked him that, personally, and as I recall, he didn't know. * * *

"The Court: Ladies and gentlemen of the jury, the testimony you have just heard as to information this witness received is, of course, hearsay information. The purpose of it is not to prove anything in connection with this offense here, except the question of what these officers, these narcotics officers, what information they had on which they acted.

"Defendant has asserted here that he was unlawfully entrapped into these transactions which you have heard about. Now, in order to meet that claimed defense the Government is entitled to show what information it had about him on which it acted. In other words, did the Government have reasonable cause to believe from the information it had, whether the information might have been true or false—did the Government have a reasonable basis for engaging in the transactions that it did, if you find that it did engage in any.

' "Do you feel that covers the situation at this time?

"Mr. Broady [Defense Counsel]: Yes, sir."

There is no evidence or claim in the case that Trice had ever been arrested or officially charged with a violation of the narcotics laws prior to the arrest on the instant charges.

We think when the instant case is laid beside the case of Sorrells v. United States, 1932, 287 U.S. 435, 441, 451, 53 S.Ct. 210, 77 L.Ed. 413, it cannot be held, as appellant appears to request, that the factual entrapment must be held illegal as a matter of law and to require reversal of the judgment because the information upon which the officers of the Narcotics Bureau acted was insufficient to justify them in believing Trice to be predisposed toward violations of the narcotic laws. In that case it is held in 287 U.S. at page 441, 53 S.Ct. at page 212, that "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises. * * * The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law. A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." In the Sorrells case, supra, a prohibition agent visited in defendant's home with three other veterans of World War I. The agent asked for whiskey but defendant stated he " 'did not fool with whiskey' ". On the third appeal, however, the defendant left his home and in a few minutes returned with half a gallon of whiskey. Four witnesses testified to defendant's good character. The defense claimed entrapment. Upon rebuttal, three witnesses testified that defendant had the general reputation of a rum-runner. There was no evidence that the defendant had ever possessed or sold any intoxicating liquor prior to the transaction in question. The court held that "[t]he predisposition and criminal design of the defendant are relevant." 287 U.S. at page 451, 53 S.Ct. at page 216. See, also, our recent case of Carlton v. United States, 9 Cir., 1952, 198 F.2d 795, for a discussion of the Sorrells opinion; United States v. Sherman, 2 Cir., 1952, 200 F.2d 880, 881, at page 882, et seq. for an analysis of the Sorrells opinion wherein the second circuit deduces the following excuses for the officers' inducement: " 'an existing course of similar criminal conduct; the accused's already formed design to commit the crime or *similar crimes;* his willingness to do so, as evinced by ready complaisance.' " [Emphasis ours.] The quotation we have just used was quoted in the Sherman case from the court's opinion in United States v. Becker, 2 Cir., 1933, 62 F.2d 1007, 1008. A comprehensive annotation to the case of Butts v. United States, 8 Cir., 1921, 273 F. 35, may be found at pages 146 et seq. of 18 A.L.R. See, also, our decision in Woo Wai v. United States, 9 Cir., 1915, 223 F. 412, and in Stein v. United States, 9 Cir., 1948, 166 F.2d 851, 853. After a thorough study of the authorities, we approve the measure of excuses for the officers' inducement as stated in the second circuit's Becker case, supra.

Whatever plausible ground for argument there may be in support of the claim that Trice was illegally induced through sympathy for his sick acquaintance, Gipson, or whatever weakness there may be in the proof as to Trice's predisposition to handle narcotics, such support and such weakness disappears with the second sale and delivery. Gipson was out of the hospital and associating with Agent Richards (as "Williams") and Trice during the period between the two sales. There was no need of a go-between for the second sale. Furthermore, there is nothing in the evidence showing that Richards used Gipson in

any way for the second deal. When the jury was considering the case after it had been submitted to it, they had definite proof of Trice's predisposition to trade illegally in narcotics. And, while it is conceivable that the jury may have found that the predisposition evidence was not sufficient in itself to justify the inducing acts of the officers as to the first deal, Trice's easy yielding to the second offer to buy was practically conclusive proof that he was predisposed and that he made both sales in the course of his willingness to deal surreptitiously and illegally in narcotics.[1]

 The appellant, however, contends that the grounds which the officer Richards, alias "Dick Williams", had as to such predisposition, was hearsay and too remote. On the question of hearsay and remoteness, the answer is two-fold. There was no objection to it at the trial, and hearsay evidence, in the circumstances, was proper. And it does not appear that the evidence was remote to the degree that it was an abuse of discretion for the court to receive it. Appellant further contends that the showing required of the officer should be measured by the same rule as laid down for probable cause in felony preliminary hearings. We find nothing in the cases requiring such rule, but we do find the term "reasonable cause" used.

From the foregoing it is plain that we do not find merit in the contention that the defendant did not have a fair trial under the requirements of the Fifth Amendment of the United States Constitution.

We may add that no motion of any kind was made by appellant at the close of government's case, nor at the close of the case before or after the jury verdict. And the appellant was content to let the evidence as to predisposition of defendant go in and be submitted to the jury without objection.

 Appellant-defendant's guilt on all counts was in the degree of demonstration. Defense counsel on appeal (who was not trial counsel) attempted a next-to-impossible task.

Affirmed.

---

1. Intention as indicated by subsequent acts is discussed by various authorities, some of which follow:

Shreve v. United States, 9 Cir., 1939, 103 F.2d 796, 803: "Intent is a state of mind difficult of precise proof and, therefore, evidence of other and surrounding circumstances may be received for the purpose of proving such intent. Acts done and declarations made after the act of which the defendant is accused are admissible as bearing on intent. Kulp v. United States, 3 Cir., 210 F. 249, 251. See also Samuels v. United States, 8 Cir., 232 F. 536, 541, 542, Ann.Cas.1917A, 711; Greenleaf on Evidence, 16th ed., vol. 3, § 15, p. 21; Jones, Comm. on Evidence, 2d ed., vol. 2, § 624, p. 1160, § 632, p. 1175; Zoline's Fed.Crim.Law & Proc., vol. 1, § 358, pp. 297–298. Interesting academically are Wigmore, The Science of Judicial Proof, 3d ed., § 119, p. 219, and Holmes, The Common Law, p. 53."

Enriquez v. United States, 9 Cir., 1951, 188 F.2d 313: In an action for conspiracy to import, conceal, transport and sell narcotic drugs, admission of record of defendant's prior conviction of violating the narcotic statute for purpose of determining state of mind or intent of defendant was not error, where the earlier crime was of a nature substantially identical with instant crime and was committed in the same general locality, and the time of the commission of the earlier crime was not excessively remote.

Holt v. United States, 6 Cir., 1930, 42 F.2d 103. Evidence of subsequent discovery of liquor on premises to negative accident and show intent was not erroneous.

Copeland v. United States, 1945, 80 U.S. App.D.C. 308, 152 F.2d 769, 770: "In a prosecution for homicide, 'the recurrence of other acts of the sort tends to negative inadvertence, defensive purpose, or any other form of innocent intent.' [Wigmore on Evidence, 3d ed., § 363.]"

Henderson v. United States, 9 Cir., 1944, 143 F.2d 681, 683: "It follows that evidence of other similar offenses was admissible to show a fraudulent plan, scheme or design, beginning with the giving away of a few coupons, going forward to the suggestion of pay, and moving logically to the acts in proof here as an integral part of it. * * *"