**UNITED STATES of America,**
**Appellee,**

v.

**Lloyd Stanley WALTON, Appellant.**

**No. 22935.**

United States Court of Appeals
Ninth Circuit.

Jan. 30, 1969.

Rehearing Denied June 3, 1969.

Robert E. Prince, Seattle, Wash., for appellant.

Eugene G. Cushing, U. S. Atty., Michael Swofford, Asst. U. S. Atty., Seattle, Wash., for appellee.

Before MADDEN, Judge of the Court of Claims, and HAMLEY and ELY, Circuit Judges.

HAMLEY, Circuit Judge:

Lloyd Stanley Walton appeals from his conviction following a jury trial on all four counts of an indictment charging violations of the narcotics and tax laws.

There were two alleged transactions, one occurring about noon on September 20, 1967, at the bar of the Cottage Restaurant, at Fifteenth and Madison in Seattle, Washington, and the other about 8:30 that evening at the same place. The first transaction pertained to the alleged sale by defendant, to an undercover agent of the Federal Bureau of Narcotics, of .431 grams of heroin in violation of 21 U.S.C. § 174 (1964), and section 4704(a) of the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 4704(a) (1964). The second transaction related to the alleged sale by defendant, to the same undercover agent, of .924 grams of heroin, in violation of the same statutes.

The evidence received at the trial, considered in the light most favorable to the Government, warranted the jury in finding as follows: at 11:30 a. m. on September 20, 1967, Joseph V. Ferro, Acting District Supervisor of the Federal Bureau of Narcotics in Seattle, received a telephone call from Julius Bishop, an informant. Bishop told Ferro that Bishop was then in the company of a seaman named "Stan," who had narcotics for sale. Ferro then arranged for Bishop to introduce Narcotic Agent Aubrey Abbey to Stan at noon on that day, at the Cottage Restaurant, as a prospective customer.

Abbey entered the restaurant at approximately 12:10 p. m. and joined Bishop and defendant on stools at the counter, at which time Bishop introduced Abbey to defendant. After a brief conversation between Abbey and defendant, in which Bishop took no part, defendant offered to sell a spoon of heroin to Abbey for $75.00. Defendant then handed Abbey a paper bindle containing narcotics.

After testing the narcotics in the restaurant washroom, Abbey paid defendant $75.00 from Government advance funds. Defendant then offered to sell Abbey more narcotics and they agreed to meet at the same place at 8:00 p. m. that evening to complete a similar transaction. Agent Ferro and Seattle Police Officer Richard B. Kurttila, seated only a few feet away, witnessed the transaction, including the exchange of narcotics and currency, but could not hear the conversation.

The second sale by defendant to Abbey was consummated at the same place about 8:30 p. m. that evening. Bishop was not present for this second transaction. Agent Ferro, Officer Kurttila and Seattle Police Officer William Henaby, saw Abbey and defendant together in the restaurant but were not close enough to witness the second transaction.

Defendant's sole defense was that of entrapment. His counsel told the jury in his opening statement that defendant would not deny that the transactions occurred. Defendant himself testified that he engaged in the two transactions.

On this appeal defendant first argues that he was not afforded a speedy trial as guaranteed by the Sixth Amendment. Defendant's argument with regard to delay may also possibly be read as invoking the Due Process Clause of the Fifth Amendment.

Insofar as the Sixth Amendment guarantee of a speedy trial is concerned, the delay in question was for the slightly more than four months between November 14, 1967, when a formal charge in the form of a secret indictment was lodged against him, and March 18, 1968, when the trial commenced. See Benson v. United States, 9 Cir., 402 F.2d 576; Lucas v. United States, 9 Cir., 363 F.2d 500, 502. Insofar as the Due Process Clause precludes unreasonable delays (see Woody v.

United States, 125 U.S.App.D.C. 192, 370 F.2d 214) the critical time span is the almost six months' period between September 20, 1967, when defendant could have been arrested, and March 18, 1968.

Defendant does not assert that the charges against him are barred by the statute of limitations. This being the case, it was incumbent upon defendant promptly to assert, in the trial court, any claim that he was being deprived of his Sixth Amendment right to a speedy trial. Defendant made no such claim in the district court with regard to the speedy trial guarantee and therefore may not obtain relief on that ground in this court. See Benson v. United States, *supra*.

Concerning the due process aspect of the delay, defendant did not, in the district court, seek dismissal of the action, but contended only that the delay contributed to the inability of the Government to produce the informant, Julius Bishop, as a witness. We will therefore consider the due process aspect of the delay problem in discussing defendant's second contention on this appeal. That contention is that he was deprived of a fair trial, and therefore of due process of law under the Fifth Amendment, because the Government was unable to produce the informant, Julius Bishop, as a witness.[1] Defendant asserts that Bishop would have corroborated his contention that he was entrapped.

The Government did not arrest defendant on September 20, 1967, because enforcement officers hoped that, by keeping him under surveillance for a period of time, the latter's source of supply could be discovered and cut off. The Government's expectations in this regard were predicated mainly upon agent Abbey's report of the conversation he had with defendant at the time of the second heroin transaction on September 20, 1967.

As testified to by Abbey (but in substance denied by defendant), defendant told Abbey that the heroin he sold to Abbey at noon on September 20, 1967, came from Hong Kong. According to Abbey, defendant said that the heroin involved in the second sale on that day came from Inchon, Korea. Abbey testified that defendant, who was a seaman, told him that he planned to return to the sea on September 23, 1967, and that he was bringing additional narcotics into the country. Defendant agreed to deliver to Abbey, upon his return, a large quantity of narcotics.

According to Abbey's testimony, defendant also advised him that defendant had been successfully peddling narcotics for the last sixteen years while he was a seaman. Abbey testified that defendant told him that his procedure in selling narcotics was as follows: he brought the narcotics into the country from the Far East aboard ship. Upon arriving in the United States, defendant would go to his home in Portland, Oregon, pick up his Cadillac, journey down the coast, and pick up his heroin which had been taken off the ship for him by others. He would then make deliveries to his customers.

On the basis of this information and arrangement, Abbey's office determined to postpone defendant's arrest. This was done so that, pursuant to a cooperative arrangement with the United States Bureau of Customs, an effort could be made to identify defendant's foreign sources of supply. It was expected that this could be accomplished with the assistance of the Federal Bureau of Narcotics' agents in Bangkok, Hong Kong and Seoul.

While, according to Abbey, defendant expected to ship out on September 23, 1967, defendant testified that he did not do so until October of that year. The federal enforcement officials thereafter maintained enough surveillance to learn that defendant was aboard the S. S. BUCKNELL VICTORY when it docked

---

1. If, in fact, defendant intends to argue that, apart from the relationship between the delay and the inability of the Government to produce the informant as a witness, the delay constituted a denial of due process, his failure to so urge in the district court precludes relief here under the rule applied in *Benson, supra.*

at San Francisco shortly before the middle of December, 1967. Arrangements had been made between the federal agencies to permit defendant to leave the ship with a cursory search, but defendant apparently left the ship before any search of his person was made, free and clear of immediate surveillance.

Defendant reached Seattle about December 14, 1967. The Federal Bureau of Narcotics soon thereafter verified this fact. Abbey, acting in an undercover capacity, tried on several occasions to contact defendant through the telephone number defendant had supplied, but was unsuccessful. Therefore, on January 31, 1968, it was decided to terminate the investigation and arrest defendant. It required some careful detective work to track down defendant's whereabouts, but this was accomplished and the arrest was made on February 1, 1968.

Prior to the trial, the district court granted defendant's motion that the Government be ordered to make known the name and address of the informant. The Government complied with the order.[2] However, the informant, Julius Bishop, could not be found at the address.

The Government advised the court and defendant that if any information concerning Bishop's whereabouts came to the attention of law enforcement officers, it would be immediately conveyed to the defendant and the court. No such information was obtained. Defendant then sought and obtained orders authorizing the use of Government funds to employ an investigator in an attempt to locate Bishop and also authorizing issuance of a subpoena for Bishop's appearance at the trial. An investigator was employed but neither he nor the United States Marshal's office could find Bishop.

The defendant then moved that the Government be ordered to produce Bishop as a witness. This motion was denied. However, upon the demand of the court, the statements made by Bishop to the narcotics agents concerning the September 20, 1967 transactions were read to the court and shown to counsel for defendant prior to the trial. The informant's statements corroborated the testimony of the Government witness summarized at the outset of this opinion. In his opening brief on appeal defendant concedes that these statements were not helpful to defendant.[3] He also makes it clear that the defendant does not contend that the Government was suppressing information concerning Bishop's whereabouts.

The circumstances described above, especially defendant's concession last referred to, establish that this is not a case for application of the rule that a fair trial is denied where the prosecution suppresses material evidence favorable to an accused, irrespective of the good or bad faith of the prosecution.[4]

The question remains whether the unavailability of the informant deprived defendant of the fair trial contemplated by the Due Process Clause of the Fifth Amendment. While defendant also invokes the Sixth Amendment right to be confronted by the witnesses against him, we think our consideration of the fair

2. We therefore have no problem here concerning the so-called "informer's privilege." See Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639; McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62.

3. In his opening brief on appeal defendant also states:
"The trial court was most fair to the defendant in granting his motions for the identity and whereabouts of the informant, the authority to use funds to employ an investigator and to order a subpoena to be issued against the informant. However, the most important item is something the trial court nor the Government had control over, the disappearance and the failure of Bishop, the informant, to appear at the trial."

4. The rule is stated and applied in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. See also, Lee v. United States, 9 Cir., 388 F.2d 737, 738; Thomas v. United States, 9 Cir., 343 F.2d 49, 53–54.

trial problem will also be dispositive of this Sixth Amendment claim.[5]

We must initially recognize that an informant stands in a position different from that of an ordinary witness whose testimony may be material because he just happened upon the scene. Bishop was purposely used by the Government to obtain evidence, and the Government must therefore assume greater responsibility for producing him as a witness than would be the case with an ordinary witness. Moreover, we must also consider the circumstance that the Government's delay in arresting defendant, however justified, may have contributed to its later inability to produce Bishop as a witness.

■ These two factors cast the question as one of whether defendant had a fair trial, for ordinarily a conviction is not to be reversed solely because an accused could not find a material witness. And since the ultimate inquiry is whether defendant had a fair trial, the controlling consideration is whether there is a reasonable possibility that, if Bishop had been available to testify, defendant would not have been convicted.

■ As indicated above, defendant conceded that he participated in the two narcotic drug sales which occurred on September 20, 1967. His only defense was entrapment. Entrapment is shown where Government agents go beyond the mere affording of opportunities or facilities for the commission of the offense and exert persuasion or pressure of one kind or another which induces the commission of a crime by one who had no predisposition to do so.[6]

■ The record is undisputed that the Government presented its agent, Abbey, as a prospective narcotics customer and arranged to have him introduced to defendant. It is therefore apparent that the Government agents afforded defendant opportunities for the commission of the offenses in question. But, as indicated above, entrapment did not occur unless the Government effort went beyond this and, by means of persuasion or pressure, induced defendant to commit the offenses even though he had no predisposition to do so. The Government had the burden of proving, beyond a reasonable doubt, that no such persuasion or pressure was exerted.[7]

■ There was ample evidence to support the implicit jury finding that the Government agents did not exert persuasion or pressure of any kind in an effort to induce defendant to commit the offenses. Walton does not contend otherwise. Instead, he argues, in effect, that if Bishop had been available to testify, there is a reasonable possibility that the jury would not have found beyond a reasonable doubt, that the Government agents did not engage in such persuasive efforts.

■ We do not agree. Defendant's own testimony established that the Government agents did not go beyond the mere affording of opportunities or facilities for the commission of the offenses. This being the case, there is no reasonable possibility that Bishop's testimony either as to the scope of the Government's

---

5. No decision has been called to our attention in which, without regard to whether the defendant was prejudiced, the Government's inability to produce an informant as a witness has been held to deprive the defendant of the right to confront the witnesses against him. Quite to the contrary, where there has been no showing of prejudice, the rule appears to be that this Sixth Amendment right has not been violated. See, for example, McCray v. Illinois, 386 U.S. 300, 313–314, 87 S.Ct. 1056, 18 L.Ed.2d 62; D'Ercole v. United States, 2 Cir., 361 F.2d 211, 212; Dear Check Quong v. United States, 82 U.S. App.D.C. 8, 160 F.2d 251, 253.

6. See Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848; Sorrells v. United States, 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413; Nordeste v. United States, 9 Cir., 393 F.2d 335, 338.

7. Robison v. United States, 9 Cir., 379 F. 2d 338, 345; Notaro v. United States, 9 Cir., 363 F.2d 169, 175.

effort to involve defendant in a narcotics transaction or as to defendant's predisposition to commit offenses of that kind would have led to an implicit jury finding that defendant was entrapped.

Defendant testified at length concerning the two transactions of September 20, 1967. He did not testify that Bishop came to him and talked him into making a sale to some customer Bishop had in mind. According to defendant, all that Bishop initially did was to come to him in a Seattle bar and ask defendant if he had any "stuff," meaning heroin. Defendant testified that he answered "no," and that ended the initial contact between the two.

Defendant testified that the next episode did not involve Bishop nor anyone else alleged to have been connected with the Government. His testimony was that, a short time after the above-described exchange between him and Bishop, a seaman whom defendant had seen in Vietnam approached defendant in the bar and said he had some "stuff." Defendant further testified that, armed with this information from the seaman, he went to Bishop, still in the bar, and reported what the seaman had told defendant.

According to defendant, Bishop and the seaman then made a "deal" which contemplated that the seaman would obtain some heroin and hand it to defendant. Defendant would then go with Bishop to another place where defendant would give the heroin to Bishop, and the latter would sell it to a third party. Defendant testified that he was to receive twenty-five dollars for his part in the transaction. He further testified that, pursuant to this deal, the seaman left, presumably to get the narcotics, and Bishop made a telephone call, presumably to Agent Ferro, as described above.

According to defendant, the seaman and Bishop then returned to the bar and the seaman gave defendant a package containing heroin. Defendant testified

that he and Bishop then drove in defendant's car to the Cottage Restaurant. About ten minutes later Abbey, whom defendant did not know, arrived. Bishop and Abbey carried on a brief conversation. According to defendant, Bishop then gave him assurances to the effect that Abbey was a legitimate customer.

Bishop introduced Abbey to defendant but declined to personally make the sale to Abbey. So, as defendant testified, there was "nothing else I could do, so I give [sic] it to him * * *," meaning that he gave Abbey the package of heroin. According to defendant, Abbey gave defendant seventy-five dollars. Defendant testified that he told Abbey that he did not know whether the heroin was good "because it didn't belong to me, * * *" but rather to the seaman. Defendant testified that he met the seaman at a bar about 2:00 p. m., and "I give [sic] him his money."

As to the second transaction, which occurred that same evening, defendant testified that after giving the proceeds of the first transaction to the seaman, the latter gave him another package of heroin. Defendant later went to his home and went to bed. About 8:00 o'clock in the evening Abbey telephoned to him and reminded defendant that the latter was supposed to meet Abbey at the Cottage Restaurant at that time. Defendant dressed and went to the restaurant where he met Abbey. Bishop was not present. Defendant gave Abbey the second package of heroin, and told Abbey that he "didn't know for sure what it was, but for him to test it." Abbey went to the washroom and tested it for purity, and thereafter paid money to defendant. They had a few drinks together and then left the restaurant.

The lack of any effort by the Government to persuade defendant to engage in narcotics sales is thus revealed by his own testimony. Without any persuasion on the part of Bishop he was ready to facilitate a transaction between Bishop and the seaman.[8] He was willing to par-

---

8. In this connection see Masciale v. United States, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed. 2d 859, where the Court said: "It is noteworthy that nowhere in his testimony did

ticipate therein for a consideration of twenty-five dollars. He exhibited the customary misgivings characteristic of narcotics peddlers when introduced to new prospective customers. He knew that heroin might or might not be "good," and was not surprised when Abbey took it to the restaurant washroom to make a test. In fact he suggested that Abbey test the second package of heroin. He noticed, and was surprised, as any experienced narcotics peddler would be, when Abbey did not use a newspaper to hide the exchange of narcotics and currency.

Moreover, during the course of his testimony, defendant used, or demonstrated his understanding of, the narcotics jargon used by experienced traffickers. Such terms as "stuff," "spoon," and "bindle" were familiar to him.[9]

We therefore conclude that whether or not defendant was predisposed to commit offenses of the kind here in question, he has established by his own testimony that the Government did not entrap him.

It is true that, at the trial, the Government countered the entrapment defense not only by evidence that it made no effort to persuade defendant to commit the offenses, but by evidence that defendant was predisposed to commit such offenses. In this connection, the Government relied in part upon the testimony of Agent Ferro to the effect that Bishop told him that defendant was a narcotics trafficker.[10] Defendant argues here, in effect, that there is a reasonable possibility that Bishop, if available, would have given probative testimony to the effect that he did not so advise the agents, or that he would have given other testimony tending to show that defendant did not have a predisposition of the kind in question.

We consider this contention notwithstanding the conclusion stated above that the jury did not need to reach the question of predisposition, since we cannot be sure that it did not consider that issue. However, in view of all of the circumstances related above, we do not believe that there is a reasonable possibility that Bishop, if available, would have given probative testimony to the effect that he did not so advise the agents, or that he would have given other testimony tending to show that defendant did not have a predisposition of the kind in question.[11]

Defendant's third and final contention on appeal is that the trial court erred in failing to strike the hearsay testimony of Agents Ferro and Abbey as to what Bishop and other informants told them concerning defendant's predisposition to traffic in narcotics.

When Agent Ferro was first asked, on rebuttal, whether he had received information concerning the propensity of defendant to commit such offenses, counsel for defendant objected on the ground that the question called for a conclusion of the witness. This objection was sustained. Ferro was then asked a series of questions which produced testimony to the effect that Bishop and another informant had told him that defendant was supplying narcotics to peddlers in Seattle.

petitioner state that during the conversation either [Government agents] * * * tried to persuade him to enter the narcotics traffic." 356 U.S. at 387–388, 78 S.Ct. at 828.

9. Upon being asked where he learned the meaning of "spoon," defendant testified, "From the seaman. He told me he had two spoons."

10. Agent Ferro testified that he received this information concerning defendant's propensity from Bishop and another unnamed informant. Agent Abbey testified that he received information to his effect from "Owl Face" Larry Johnson, no mention being made of Bishop.

11. There are also additional circumstances supporting this conclusion. We know that Bishop arranged for the meeting between Abbey and defendant which actually occurred. He could hardly have arranged this without knowing of defendant's background. We also know that if Bishop had testified contrary to the information Ferro said Bishop had given him concerning defendant's predisposition, he would have been confronted with his written statements which corroborated Ferro's testimony in this regard.

Counsel for defendant offered no objection to this line of questioning.

After this testimony by Ferro had been fully developed, the prosecutor asked Ferro whether Bishop said anything to him as to whether the "Stan" referred to by Bishop was the same "Stan" that Bishop had referred to in previous conversations with Ferro during the summer of 1967. After Ferro answered "Yes," counsel for defendant, for the first time objected on the ground that the question called for hearsay. Counsel did not move to strike any of the previous testimony Ferro had given, as described above. The objection was overruled. When Abbey was thereafter led over the same line of inquiry, counsel for defendant offered no objection.

While this whole series of questions asked of Ferro and Abbey called for hearsay testimony and was not admissible under any exception to the hearsay rule,[12] the point was not sufficiently preserved to entitle defendant to raise the question here.

▄▄▄ Moreover, defendant was not aggrieved by the admission of this hearsay because counsel for defendant had already, on his initial cross examination, elicited similar hearsay. Counsel for defendant asked Abbey how long he had considered defendant a narcotics suspect.

Abbey replied, "We had received information regarding him for approximately, maybe four months prior." Later, on the same cross examination, counsel asked Abbey what records he had indicating or leading Abbey to suspect that defendant was in the narcotics trade. Abbey replied, in effect, that an informant in the Seattle area, other than Bishop, had told him that "Stan" was at sea and would bring narcotics on his return to this country.[13]

Likewise, when Ferro was under initial cross examination, prior to his recall as a rebuttal witness, counsel for defendant asked him where he learned that defendant was dealing with other parties in the area. Ferro replied, "From other informants." Counsel for defendant then continued this line of cross examination and drew from Ferro the testimony that he "had information" for several months concerning defendant's other narcotics activity in the area. Counsel for defendant did not express surprise in obtaining hearsay answers to his questions asked of Abbey and Ferro on cross examination, nor did he seek to strike the hearsay his own questions brought forth.

We accordingly hold that the reception of the described hearsay, received during the rebuttal testimony of Abbey and Ferro, was not reversible error.

Affirmed.

12. The trial court overruled the objection on the ground that the inquiry was whether the officers had reasonable grounds to believe defendant had a predisposition to traffic in narcotics. The court reasoned therefrom that Ferro's testimony as to what Bishop told him concerning defendant's propensity was intended only to demonstrate what advice they had received from a reliable informant and not to establish the truth of what Bishop told Ferro. If this were true, the testimony would not be hearsay.

There is language in at least one decision of this court tending to support the view that the critical predisposition inquiry is whether the officers had reasonable grounds to believe the accused had a predisposition to commit offenses of this kind. See Trice v. United States, 9 Cir., 211 F.2d 513, 516. The more recent entrapment decisions, however, in holding that the burden of proof to negate entrapment is on the Government, establish that the critical issue on the predisposition facet of that defense is not whether the officers who induced the accused had reasonable grounds to believe he had such a propensity, but whether he did, in fact, have such a propensity. See Robison v. United States, 9 Cir., 379 F.2d 338, 345; Notaro v. United States, 9 Cir., 363 F.2d 169, 175.

13. Similarly, after Abbey had been recalled by the Government for rebuttal testimony and was under cross examination by counsel for defendant, the latter drew from Abbey the testimony that, during a conversation with a trafficker named Owl Face Larry Johnson, Johnson told Abbey that defendant would sell narcotics.

## ORDER

The petition for rehearing is denied.

HAMLEY, Circuit Judge (concurring in the order denying petition for rehearing):

Since the sole purpose of this concurring opinion is to comment upon the dissent to the order denying the petition for rehearing, the dissent should be read first.

Walton was convicted of two violations of the narcotics and tax laws. He was given concurrent sentences. Walton's only defense was entrapment. With regard to the first transaction, which occurred about noon on September 20, 1967, Walton alleged that he was entrapped by Narcotic Agent Aubrey Abbey and a Government informant, Julius Bishop. Bishop was not present at the time of the second transaction, which took place in the evening of the same day. Walton's allegation of entrapment on that occasion was therefore limited to the activities of Agent Abbey.

The dissent is directed exclusively to the asserted error of the trial court in preventing Walton from testifying as to what Bishop told him when they met at a tavern prior to the first transaction. For the following reasons I do not believe this asserted error entitles Walton to a rehearing and a reversal of the convictions:

1. *Point raised for first time in petition for rehearing.* This question was not raised in Walton's briefs on appeal, nor in oral argument, but was advanced for the first time in his position for rehearing. The question therefore ought not to be considered now unless it involves plain error. Higa v. Transocean Airlines, 9 Cir., 230 F.2d 780, 786, on petition for rehearing; Mitchell v. Greenough, 9 Cir., 100 F.2d 1006.

I do not believe that the exclusion of this evidence constituted plain error affecting substantial rights (Rule 52[b], Federal Rules of Criminal Procedure), thereby permitting consideration of the question at this time. As stated in the opinion, Narcotic Agent Abbey, whom the jury obviously believed, testified that Walton told him that he (Walton) had been successfully peddling narcotics for the last sixteen years. According to Abbey, Walton revealed the exact procedures he followed in bringing narcotics from Hong Kong and Korea and distributing them in the Pacific Northwest. It taxes credulity to believe that such a man could have been unlawfully entrapped by what Bishop may have told him on the morning of September 20, 1967. An additional reason why there was no plain error is set forth under point 4 below.

2. *Failure to make an offer of proof.* At the trial Walton should have been permitted to testify as to his conversation with Bishop prior to the first narcotics transaction. However, no offer of proof was made demonstrating that such testimony would have revealed anything significant with regard to the entrapment defense. Accordingly, we have no way of ascertaining whether the erroneous sustaining of the objections to these questions was prejudicial to Walton. For all we know, Walton's testimony concerning Bishop's conversation would have been wholly innocuous.

The fact that the questions were proper does not excuse the failure to make an offer of proof. On the question of prejudice the problem does not involve the propriety of the questions, but whether they would have elicited any testimony helpful to the party in whose behalf the questions were asked. Only an offer of proof would have revealed this.

Walton asks us to accept two brief excerpts from his testimony (cut off or stricken by the trial court) as a substitute for an offer of proof. One of these excerpts was to the effect that Bishop would buy "two pieces" of "stuff" from Walton. The other was to the effect that Bishop wanted Walton to go with Bishop to get the "stuff" from an unnamed seaman, and that Bishop wanted more "stuff."

Even if we accept these bits of testimony as offers of proof, it is plain in my opinion that remarks of this character

made by Bishop, have no tendency to show that Walton was unlawfully entrapped. As stated in the opinion, entrapment is shown where Government agents go beyond the mere affording of opportunities or facilities for the commission of the offense and exert persuasion or pressure of one kind or another which induces the commission of a crime by one who had no disposition to do so.

If Bishop said anything else to Walton, which tended to show entrapment, there should have been an offer of proof covering it. See Fiano v. United States, 9 Cir., 271 F.2d 883, 885. On the fragmentary and informal offer of proof that was made, no prejudice in excluding the testimony was shown.

3. *Any error was cured.* If there was prejudicial error in excluding this evidence during the course of the trial, it was cured when the trial court reopened the trial to permit Walton to testify concerning remarks made to him by Bishop and the unnamed seaman.

Upon consideration of the entire reporter's transcript of the reopened trial, quoted in a footnote to the dissent, I do not agree that Walton was unduly restricted in giving such testimony.

Eight questions were asked of Walton during the reopened trial. It may be that, in rejecting the first question asked of Walton after that trial had been reopened, the trial court unnecessarily restricted Walton's testimony. That question: "Mr. Walton, would you please set forth to the Court the conversation that transpired between yourself and Mr. Bishop at. * * *" probably should not have been cut off.

But any error in this respect was cured a moment later when, in cutting off the second question, which was obviously leading, the trial judge said: "Why don't you direct his [Walton's] attention to a specific subject matter which you want him to talk about, and then ask him to relate the conversation?" Had counsel for Walton accommodated himself to this suggestion he could have asked Walton about any conversation he had with Bishop relevant to the entrapment defense. But, instead, counsel came back with a question (the third question) which contained a number of recitals which the trial judge was warranted in rejecting.

Counsel then asked Walton a proper question, (the fourth question) "What did Mr. .Bishop state to you once you informed him that the seaman had this stuff?" Walton began to make an unresponsive answer. His own counsel cut him off by repeating his proper question (the fifth question). Walton answered the question without objection, saying: "That he would take a piece, he wanted a piece, he had some people that wanted quite a bit."

Counsel then asked Walton whether Bishop asked Walton to get this piece from the seaman (the sixth question). Walton answered "Yes," without objection. But then Walton went on to make an unresponsive comment about the seaman, and he was again properly stopped by the trial judge. This ended Walton's examination by his counsel as to his conversation with Bishop. The seventh and eighth questions, pertaining to Walton's conversation with the seaman, were answered without objection. In my opinion Walton was not limited in testifying to his conversation with either Bishop or the seaman—he just had nothing significant to report relevant to the entrapment defense.

The dissent quotes a remark by the trial court to the effect that Walton would be permitted to tell what the *seaman* said to Walton. The dissent seems to be making the point that the trial court was thereby preventing Walton from testifying as to what Bishop (rather than the seaman) said. But this remark by the trial court was made with reference to Walton's unresponsive testimony (in answer to the sixth question) "Yes, and the seaman refused to go along with it." As indicated above, Walton was permitted to testify as to what Bishop told him.

4. *Any error related only to the conviction based on the first narcotics transaction.* If there was prejudicial error in refusing to permit Walton to testify as to what Bishop told him, it related only to the first narcotics transaction on September 20, 1967. Bishop was not present that evening when Walton made his second sale to Abbey. How could anything Bishop said to Walton at noon on September 20, 1967, with reference to a narcotics transaction shortly to be consummated between Walton and Abbey, "entrap" Walton with reference to a second transaction Walton had with Abbey in the absence of Bishop, at 8:30 p. m. that evening?

The sentences were concurrent. Therefore error as to the first transaction, which could not have infected the second, need not be noticed. Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed.2d 321; Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692; Mendez v. United States, 9 Cir., 349 F.2d 650, 652; Head v. United States, 9 Cir., 346 F.2d 194, 196; Brothers v. United States, 9 Cir., 328 F.2d 151, 157. Federal judges are adjured, by Rule 52(a), Federal Rules of Criminal Procedure, to disregard any error, defect, irregularity or variance which does not affect substantial rights.

ELY, Circuit Judge (dissenting):

After reveiwing appellant's Petition for Rehearing, the parties filed supplemental briefs at the court's request. My study of these briefs, together with my reexamination of the record, convinces me that I was mistaken in my original concurrence in the result reached in the challenged opinion.

The only defense presented by the accused was that he had been entrapped into the commission of his offenses by a government agent who had disappeared during the long interval between the time when the alleged entrapment occurred and the times when Walton was eventually arrested and his trial conducted. When the defense of entrapment is asserted, a showing that the offense was attended by the intervention of a government agent casts the burden upon the Government to prove, beyond a reasonable doubt, that entrapment did not occur. Notaro v. United States, 363 F.2d 169 (9th Cir. 1966).

Walton undertook to testify in his own defense, but in the beginning, the Court prohibited him from relating the conversations, claimed to have been entrapping, which he had with the government agent. In its supplemental brief, the Government, citing Silva v. United States, 212 F.2d 422 (9th Cir. 1954), and Trice v. United States, 211 F.2d 513 (9th Cir.), cert. denied, 348 U.S. 900, 75 S.Ct. 222, 99 L.Ed. 707 (1954), in effect concedes that the original evidentiary ruling of the trial judge was mistaken. The trial judge ultimately recognized the error of his ruling. This recognition developed near the end of the trial, during a discussion concerning appropriate jury instructions. Reopening of the evidentiary proceedings was allowed for the expressed purpose of permitting Walton to present testimony as to the content of the allegedly entrapping conversations. The Court remarked:

"Members of the Jury, the Court has granted the defendant the opportunity to reopen for the purpose of examining the defendant and permitting him to testify with respect to conversations he had with the informant, Bishop."

The Court, however, erroneously failed to allow fulfillment of the stated purpose. For some reason which I cannot perceive, the Court immediately thereafter, and without objection having been interposed by the prosecution, again prohibited Walton from relating the conversations which the jury had been led to believe would be forthcoming. The Court, again reversing itself, remarked to Walton's counsel:

"What I am going to permit you to do is to have him tell what the *seaman* [not the government agent] said to him." (Emphasis added).

Obviously, one who claims to have been entrapped should be permitted to testify

about his conversations with the Government's alleged entrapping agent, otherwise, an entrapped defendant could never establish his defense if only he and the entrapping agent were involved in the entrapping conversations and the entrapping agent had disappeared, as here, before the time of the trial.

The irregularities which I have outlined were of such significance, I think, that a new trial should be required. The full record of the reopened proceedings is set forth in the margin.[1] To me, it reveals the imposition of such restrictions upon the introduction of Walton's

1. "THE COURT: Good morning, Members of the Jury, Counsel. Let the record show that the defendant and his Counsel are present in court and the jury present in the jury box.

"*Members of the Jury, the Court has granted the defendant the opportunity to reopen for the purpose of examining the defendant and permitting him to testify with respect to conversations he had with the informant, Bishop.* I am permitting him to do that, and I will allow the testimony, not for the purpose of proving the truth of anything that Bishop said as related by the defendant, but for the purpose of enabling you to consider what the defendant said that Bishop said to him in order to enable you to determine his state of mind and the question of intent as I will hereinafter instruct you with respect to that term.

"MR. PRINCE: Thank you, your Honor, Mr. Walton, will you take the stand?

"LLOYD STANLEY WALTON, the defendant, re-called as a witness in his own behalf, was examined and testified further in surrebuttal as follows:

"THE CLERK: You are still under oath, Mr. Walton.

"DIRECT EXAMINATION

"BY MR. PRINCE:

Q Mr. Walton, would you please set forth to the Court the conversation that transpired between yourself and Mr. Bishop at—

"THE COURT: No, I am not going to permit that, Mr. Prince. I am going to let you ask him specific questions dealing with that. You are going to get into trouble the minute you start to do it that way.

Q (By Mr. Prince) Mr. Walton, did Mr. Bishop tell you what the—

"THE COURT: Now, wait a minute. Why don't you direct his attention to a specific subject matter which you want him to talk about, and then ask him to relate the conversation? What you started to do is to suggest to him the answer you want, and that I won't permit.

Q (By Mr. Prince) Mr. Walton, you stated in your testimony before the jury that following the conversation with Mr. Bishop you were later approached by a seaman. You then state that you went back and sat down and had some drinks with Mr. Bishop.

"THE COURT: No, I shall not permit you to make a speech at this time, Mr. Prince, before this jury. *If you want to ask him what Mr. Bishop said to him concerning a seaman, I will permit you to ask that.* In your argument you can say what you want about the testimony, but I am not going to let you make a speech of that kind here now.

"MR. PRINCE: Yes, Your Honor.

Q (By Mr. Prince) What did Mr. Bishop state to you once you informed him that the seaman had this stuff?

A Well, Mr. Bishop approached me about some stuff that morning.

Q Just answer the question. You have testified as to this. What did Mr. Bishop say to you once you told him that the seaman had some stuff?

A That he would take a piece, he wanted a piece, he had some people that wanted quite a bit.

Q Did he ask you to get this piece from the seaman?

A Yes, and the seaman refused to go along with it.

"THE COURT: Well now, you see you are not doing what I am giving you permission to do, Mr. Prince. You asked if he did do that, and he says yes or no. What I am going to permit you to do is to have him tell what the *seaman* said to him.

Q (By Mr. Prince) What did the seaman say to you?

A The seaman said he wouldn't go with Bishop, and that if I would go with Bishop that he would give me $25 and Bishop was to make the transaction.

Q This is what the seaman said?

A Yes.

"MR. PRINCE: All right, I have no further questions, your Honor.

"MR. SWOFFORD: Nothing, your Honor.

"THE COURT: Thank you, You may step down, Mr. Walton." (Emphasis added).

permissible defensive testimony as to impair, prejudicially, his right to a fair and orderly trial.

2. My opinion that our original decision was wrong has now been strengthened by the fact that my dissenting views are believed to have such force as to require that additional reasons be offered in attempted refutation.

I shall not extend the dialogue unduly. The disagreement between my distinguished Brothers and myself arises from honest differences as to the correct interpretation of the proceedings set forth in footnote 1 of my above opinion.

Judge Hamley mentions but apparently attaches no controlling significance to the fact that appellant's counsel did not, in the beginning, specifically direct our attention to the irregularities in question. Neither do I. We see them, and they are so grievous that we should not, in my opinion, now seek refuge behind Rule 52. It does not obscure the mistaken result of our original opinion, and I choose to acknowledge the mistake and accept my full share of the responsibility for it.

The plain fact, the "plain error," is that Walton was erroneously prevented from the presentation of testimony which might have established a valid defense, the only defense which he offered. Judge Hamley's observation that the jury "obviously believed" one of the Government's agents is immaterial, for Walton's possibly contradictory testimony was consistently excluded.

The most significant question was the very first which Walton's appointed counsel presented in the reopened proceeding: "Q Mr. Walton, would you please set forth to the Court the conversation that transpired between yourself and Mr. Bishop at —", whereupon the Court, for some inexplicable reason which I cannot perceive, interrupted with, "No, I am not going to permit that, Mr. Prince." The question was so obviously "designed to elicit Bishop's * * * statements" that there was no need for an offer of proof to apprise the District Court of the purpose. *See, e. g.,* United States v. Lowrie, 246 F.2d 472 (4th Cir. 1957); Hawkins v. Missouri Pac. R.R., 188 F.2d 348 (8th Cir. 1951); Hoffman v. Palmer, 129 F.2d 976 (2d Cir. 1942), aff'd, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1942). Cf. Marrone v. United States, 355 F.2d 238 (2d

I would grant the Petition for Rehearing and reverse the judgment of conviction.[2]

Cir. 1966); Moss v. Hornig, 314 F.2d 89 (2d Cir. 1963).

It is true, as Judge Hamley writes, that "For all we know, Walton's testimony concerning Bishop's conversation, would have been wholly innocuous." But it is also true, since the defense was entrapment, that, "for all we know," the erroneously excluded testimony would have saved Walton. It is conceded that the interruption of the first question put during the reopened proceedings was erroneous. When a defender's question precisely calls for admissible defending testimony and the testimony is erroneously rejected, I am aware of no rule which requires that conviction be affirmed upon the basis of speculation that admissible but rejected and unknown testimony *might* "have been wholly innocuous."

As to the proposition that the error was cured, we must not forget that the error was first committed during and throughout Walton's first attempt to testify. The reopened proceedings might have been so conducted as to correct the error, but the error was recommitted when the very first question was propounded, and its effect upon Walton's appointed counsel must have been "chilling" indeed. I therefore cannot conscientiously agree that the frustrated and severely restricted efforts of Walton's lawyer, understandably feeble and confused, "cured" the gravely prejudicial error which adversely affected the defense from the beginning. As I see the record, particularly the aborted proceedings set forth in my footnote 1, *supra*, the supposed "cure" was, in fact, a *coup de grace!*

Finally, it should not be overlooked that it was Bishop's conversation, the first relevant conversation, that Walton claims to have set in motion the alleged entrapping scheme which produced the commission of both the charged offenses. Thus, reliance upon the "concurrent sentence" rule is misplaced, even should we assume that the Supreme Court will not soon abandon it. *See* Benton v. Maryland, 1 Md.App. 647, 232 A.2d 541 (Md. Ct.Spec.App.1967), *cert. granted*, 392 U.S. 925, 88 S.Ct. 2297, 20 L.Ed.2d 1384 (1967 Term), *reargument ordered*, 393 U.S. 994, 89 S.Ct. 481, 21 L.Ed.2d 460 (1968) (renumbered No. 201, 1968 Term).