Jerome **BENSON**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 22098.

United States Court of Appeals
Ninth Circuit.

Oct. 21, 1968.

Peter L. Sanford, San Jose, Cal., for appellant.

Joseph L. Ward, U. S. Atty., Robert S. Linnell, Asst. U. S. Atty., Las Vegas, Nev., for appellee.

Before BARNES, JERTBERG and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Benson appeals from a judgment of conviction of violation of 21 U.S.C. § 174. The trial was to a jury. On this appeal, he makes two claims: 1) that delay from the day the offense was committed to the day of his arrest deprived him of due process, contrary to the Fifth Amendment, and of his right to speedy trial, contrary to the Sixth Amendment, and 2) that the receipt in

evidence of a prior statement of a witness, and the failure of the court to give a limiting instruction, was fatal error. We reject the first claim and sustain the second.

Benson was accused of selling heroin to a federal narcotics agent, one William Turnbou, on October 5, 1965. No complaint was filed, however, until March 3, 1966, some five months later. On March 7, 1966, a warrant for arrest was issued. Benson was not arrested until January 13, 1967, some 15 months after the offense. He was indicted on January 20, 1967, and tried on April 27, 1967. He had retained counsel. No motion to dismiss was made under Rule 48(b), F.R.Crim.P. Indeed, no such claim relating to delay as is now made was asserted before the trial court at any time or in any manner.

The record contains almost no information as to the reasons for the delays. Sergeant McCarthy of the Las Vegas police, who was doing surveillance but did not see or participate in the transaction, gave the following evidence on cross-examination:

"Q. When was the defendant arrested?

A. I don't recall. He was a fugitive for some time.

Q. Why didn't you go back in the hotel that night [October 5, 1965] and arrest him?

A. Mainly because we were arresting on a series of buys, and this would have jeopardized any value that Agent Turnbou might have gained through this one transaction.

Q. You made no attempt at all to place him under arrest at that time?

A. No sir."

There is nothing else.

Benson's conviction rests almost wholly on the testimony of Turnbou. This is his story: He and one Booker, an informer, went in Booker's car to Benson's hotel. They proceeded to Benson's room, where they found a "female".[1]

---

1. Why does a policeman say "female" instead of "woman" or "girl"?

Booker left and returned in a few minutes with Benson. Booker introduced Turnbou to Benson as "Bill," who wanted heroin. Turnbou said he wanted a "bag" (20 capsules). Benson said it would cost $60 and that he would have to go to his source of supply. Benson told Turnbou to wait, and then left with Booker; they returned in about half an hour. Benson asked for the money, Turnbou handed $60 to Booker, and Booker handed it to Benson. Benson produced from his pocket a balloon containing 20 capsules of heroin and handed it to Booker, who handed it to Turnbou.

The government called two other witnesses. Sergeant McCarthy testified that he, Turnbou, and Booker made plans to buy narcotics. He and another detective tailed the Booker car to the hotel. He saw Booker and Turnbou go in, then Booker came out and a short time later came back with Benson. In a few minutes Turnbou, Benson, Booker, and a "female," left. In 45 minutes they all returned and re-entered the hotel. (He thus, in one respect, contradicted Turnbou.) Later, at Turnbou's hotel, Turnbou produced a red balloon containing capsules of heroin.

Booker was called but declined to testify, saying: "I stand behind the Fifth Amendment."

Benson took the stand; this is his story: On the evening in question, he and his girl friend were in his hotel room; Booker, who had a room across the hall, came to Benson's door with Turnbou. Booker asked if Benson had any "stuff" and Benson said "No." Booker, but not Turnbou, was admitted and the door was closed. Booker asked if "Cotton" had something, and Benson said he did not know. Booker said "Well, come go with me." They went to Booker's car, in which another man was sitting, got in, and went to Monroe and H Streets, where Booker got out. Booker went into a dwelling while Benson waited. Booker returned after 15 or 20 minutes and they went back to Benson's room, where they found the girl friend and McGee. They stayed a few minutes and then Booker left. Benson did not sell Turnbou narcotics nor receive any money from Turnbou. Benson did not claim loss of memory; he was quite positive as to what happened.

Benson then called Booker, who had had a change of heart. He did indicate some loss of memory: "It's been quite a while." He corroborated Benson's story. On cross-examination he identified a written statement, prepared by Turnbou on the night of October 5, 1965, and initialled and signed by Booker after the return to Turnbou's hotel. When government counsel undertook to cross-examine as to the contents of the statement, Benson's counsel objected, on the ground of hearsay. The objection was overruled because the statement was being used for impeachment. As to most matters, Booker said he did not remember. As to some, he said the statement was correct.[2] He remained positive that

2. "You stated to Turnbou, did you not, on that date, Mr. Booker, that you found 'Black Cat [Benson] at room. 23.' of the Jackson Hotel?
A. That's correct.
Q. And is it not also true that you introduced Agent Turnbou to him?
A. I can't recall.
Q. I see. Is it not also a fact Mr. Booker, that Mr. Turnbou and yourself ordered a bag of heroin from Mr. Benson? Do you remember that?
A. We requested a bag of heroin from Mr. Benson.
 * * * * *
Q. Let me ask you this, Mr. Booker. Is any of it [the statement] correct?

A. Yes, sir.
Q. What part is not correct?
A. Here's one part that's not correct about he handed me the money, the $60 * * *.
This part about Agent Turnbou handed me the $60, which I in return immediately handed over to Mr. Benson.
Q. (Robert S. Linnell) You say that is not correct?
A. No, sir, that isn't.
Q. Although as I understand your testimony, you read this before you signed it?
A. Yes, I read through it."

he, not Benson, received the money, bought the heroin, and delivered it to Turnbou.

Not content with the foregoing, the prosecutor went further and recalled Turnbou, who identified the statement and described how he wrote it, read it to Booker and gave it to Booker to make corrections and sign it. Government counsel then offered it in evidence. Benson's counsel objected:

> "Object, your Honor, on the basis that it's not the writing of the defendant, that it was not freely and voluntarily given nor signed."

The objection was overruled. On cross-examination, Turnbou stated that he had been in Booker's hotel room on the night in question.

The statement, Exhibit 6, consists of two handwritten pages. The record shows that, as it was presented to Booker and received in evidence, the second page was on top of and stapled to the first. The first page corroborates Turnbou in almost every particular, and all of it relates to this case. The second page, which is what the reader first sees, is quite different. We quote:

> "When we went to 717 Madison Street all of us went into the house. I recognized the man in the house as Elmer Cotton. Cotton bagged up between ten & fifteen balloons filled with caps of heroin. Black Cat [Benson] put the balloons inside his shirt pocket before we left.
>
> Personal Descriptions:
>
> JEROME BENSON. [Physical description omitted.] He lives in Jack-

son Hotel in Room #23. I have known him for 5 years and have had 15 narcotic transactions with him.

> ELMER COTTON. [Physical description omitted.] I have known him 8 years and have had about 4 heroin transactions with him.
>
> LUCILLE WASHINGTON. [The 'female,' physical description omitted.] I have known her 6 years and she is addicted to heroin. I have bought marihuana from her about 20 times. She lives in Apt. #23 with Benson."

The court gave no limiting instruction regarding the Booker statement; it was not asked to do so. Apparently the jury had the statement with them in the jury room. Government counsel referred to it in his arguments.[3]

1. *The delay in charging and arresting Benson.*

Until recently, there has been little discussion in the cases regarding delay in filing a charge and making an arrest after the government knows of the offense and the identity of the offender. See: Note, The Right to a Speedy Trial, 20 Stan.L.Rev. 476 (1968); Note, "Justice Overdue—Speedy Trial for the Potential Defendant," 5 Stan.L.Rev. 95 (1952); Note, "The Right to a Speedy Criminal Trial," 57 Colum.L.Rev. 846, 848 (1957).

 We have held that the right to a speedy trial guaranteed by the Sixth Amendment does not arise until a formal complaint is lodged against the defendant.[4] Thus, Benson's reliance on

---

3. "Now, you will have before you when you're deliberating the merits of this case Exhibit 6. Exhibit 6 as you will see is a statement signed and adopted by Mr. Booker, witnessed by Agent Turnbo [sic] and others. And if you will read that, you will see that Mr. Booker at that time at least corroborated what Agent Turnbou testified to here in Court right down the line.

I'm not going to say that Mr. Booker was lying then. I'm not going to say he was lying when he was on the stand. He had to be lying at one time, assuming

that he read and understood, and I believe Agent Turnbou testified that he read 6, read the statement to him before he handed it to him to read himself, but his testimony and the statement are different as you'll be able to see. It's going to be up to you to say where truth lies. It's going to be up to you to judge his credibility as a witness."
Defense counsel also discussed the exhibit and Booker's motive for signing it, as did government counsel in rebuttal.

4. Venus v. United States, 9 Cir., 1960, 287 F.2d 304, 307, rev'd per curiam on

the Sixth Amendment is misplaced.[5] Similarly, Rule 48(b) F.R.Crim.P. does not apply to Benson's claim.[6] The rule applies to a defendant who has been held to answer in the district court. If he has a valid claim, it must rest upon an assertion that he has been denied due process of law in violation of the Fifth Amendment.

■ Benson relies on a line of cases in the District of Columbia Circuit which hold that such delay may be a deprivation of due process.[7] We need not and therefore do not decide whether, and if so to what extent, we would follow the District of Columbia cases. Here, there was never any assertion by Benson in the trial court that there was any improper delay, either in filing the complaint or in arresting him. This is fatal to the claim now made.

■ We start with the proposition, recently stated by the Supreme Court, that " * * * the applicable statute of limitations * * * is usually considered the primary guarantee against bringing overly stale criminal charges."

United States v. Ewell, 1966, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627. We have said that an indictment may be returned at any time within the period prescribed by the statute of limitations; that there is no merit in the contention that the defendant should have been arrested sooner. Venus v. United States, 9 Cir., 1961, 287 F.2d 304, 307, vacated per curiam on other grounds, 368 U.S. 345, 82 S.Ct. 384, 7 L.Ed.2d 341. There are many decisions in accord.[8] It seems to us to follow that, if there are special circumstances amounting to a denial of due process, that make a particular case an exception to this rule, the defendant should promptly bring the claim to the trial court's attention. If he fails to do so, the claim is no longer open to him, and cannot be raised for the first time on appeal.

■ A similar rule has often been applied to a claim that the defendant has been denied a speedy trial. The claim cannot be asserted unless he has asked for a speedy trial.[9] This court has held,

---

other grounds, 368 U.S. 345, 82 S.Ct. 384, 7 L.Ed.2d 341 (1961); D'Aquino v. United States, 9 Cir., 1951, 192 F.2d 338, 350; Lucas v. United States, 9 Cir., 1966, 363 F.2d 500, is not to the contrary. There we said that the earliest date upon which the right to a speedy trial could attach was the date of arrest, which in that case preceded the indictment. The arrest, however, was upon a warrant previously issued. See also Sanchez v. United States, 9 Cir., 1965, 341 F.2d 225, 228, n. 3; cf. United States v. Feinberg, 2 Cir., 1967, 383 F.2d 60, 64–65 and cases there cited.

5. Powell v. United States, 1965, 122 U.S. App.D.C. 229, 352 F.2d 705; Ross v. United States, 1965, 121 U.S.App.D.C. 233, 349 F.2d 210; Nickens v. United States, 1963, 116 U.S.App.D.C. 338, 323 F.2d 808, 809, cert. denied, 379 U.S. 905, 85 S.Ct. 198, 13 L.Ed.2d 178 (1964); Hoopengarner v. United States, 6 Cir., 1959, 270 F.2d 465, 469; Terlikowski v. United States, 8 Cir., 1967, 379 F.2d 501, 504.

6. Rule 48(b) reads:
 "(b) BY COURT: If there is unnecessary delay in presenting the charge

to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."
See Nickens v. United States, supra n. 5, 323 F.2d at 809.

7. E. g., Nickens v. United States, supra n. 5; Ross v. United States, 1965, 121 U.S. App.D.C. 233, 349 F.2d 210; Woody v. United States, 1966, 125 U.S.App.D.C. 192, 370 F.2d 214.

8. Carlo v. United States, 2 Cir., 1961, 286 F.2d 841, 846; United States v. Holliday, 2 Cir., 1963, 319 F.2d 775; United States v. Simmons, 2 Cir., 1964, 338 F. 2d 804, 806; United States v. Wilson, 2 Cir., 1965, 342 F.2d 782, cert. denied, 382 U.S. 860, 86 S.Ct. 119, 15 L.Ed.2d 98; United States v. Hammond, 2 Cir., 1966, 360 F.2d 688, 689.

9. Collins v. United States, 9 Cir., 1946, 157 F.2d 409, 410; United States v. Bennett, 2 Cir., 1966, 364 F.2d 499; United

and so have others, that failure to assert the claim is an acquiescence in the delay and a waiver of the right.[10] If this be the rule in Sixth Amendment cases, involving a specifically defined constitutional right, we think that it should *a fortiori* be the rule in cases such as this, where proceedings are begun within the period of the statute of limitations and the claim must be based upon facts that might make the usual rule in such cases inapplicable. Several cases have applied the rule to cases like this.[11] We agree with them.

2. *The use of Booker's statement.*

 It is well settled that a prior inconsistent statement of a witness can be used to impeach him.[12] Therefore, counsel's first objection, on the ground of hearsay, was insufficient, and the court's ruling that the statement could be used for impeachment was correct. It is equally well settled that such a statement, so used, should not become substantive evidence in the case.[13] Therefore it would have been proper for counsel to ask for an instruction explaining to the jury the limitation of the use of the statement to purposes of impeachment.[14] However, counsel did not then, or at any time, request such an instruction. In the usual case, the court is not required to give such an instruction *sua sponte* and Rule 30, F.R.Crim.P., is a barrier to counsel's claiming error here.[15] Failure to give such an instruction is usually not plain error.[16] If the prosecutor had done no more than cross-examine Booker on those matters in the

States v. Lustman, 2 Cir., 1958, 258 F.2d 475, 478; United States v. Kaye, 2 Cir., 1958, 251 F.2d 87, 90–91; Pietch v. United States, 10 Cir., 1940, 110 F.2d 817, 819, 129 A.L.R. 563; Worthington v. United States, 7 Cir., 1924, 1 F.2d 154.

10. D'Aquino v. United States, supra n. 4, 192 F.2d at 349–50; Collins v. United States, supra n. 9; United States ex rel. Von Cseh v. Fay, 2 Cir., 1963, 313 F.2d 620, 623; United States v. Lustman, supra n. 9; Pietch v. United States, supra n. 9.

11. Chapman v. United States, 2 Cir., 1967, 376 F.2d 705, 707; United States v. Beigel, 2 Cir., 1967, 370 F.2d 751, 757; United States v. Bennett, supra n. 9; United States v. Booker, 2 Cir., 1966, 363 F.2d 856; United States v. Smalls, 2 Cir., 1966, 363 F.2d 417, 419; United States v. Sanchez, 2 Cir., 1966, 361 F.2d 824; D'Ercole v. United States, 2 Cir., 1966, 361 F.2d 211; United States ex rel. Cseh v. Fay, supra n. 10. The rationale for the rule is well stated in Chapman v. United States, supra.

12. Bieber v. United States, 9 Cir., 1960, 276 F.2d 709, 713; Stevens v. United States, 9 Cir., 1958, 256 F.2d 619, 623; United States v. Barnes, 6 Cir., 1963, 319 F.2d 290; Walker v. West Coast Fast Freight, Inc., 9 Cir., 1956, 233 F.2d 939–42, III Wigmore, Evidence §§ 1017–18 (3d ed. 1940).

13. Bridges v. Wixon, 1945, 326 U.S. 135, 153, 65 S.Ct. 1443, 89 L.Ed. 2103; Southern Railway Co. v. Gray, 1916, 241 U.S. 333, 337, 36 S.Ct. 558, 60 L.Ed. 1030; Stevens v. United States, supra n. 12; United States v. Barnes, supra n. 12; III Wigmore, supra n. 12, § 1018. While the writer of this opinion agrees with Wigmore's view that because it is the witness' own statement upon which he is being cross-examined the purposes of the hearsay rule are satisfied and the statement should be generally admissible, the federal authorities are all to the contrary. If Wigmore's view is ever to be adopted, it will have to be by the Supreme Court, whose decisions we must follow. Cf. the comments of Judge Barnes in Stevens v. United States, supra n. 12, 256 F.2d at 623, n. 9.

14. United States v. Barnes, supra n. 12.

15. Seeber v. United States, 9 Cir., 1964, 329 F.2d 572, 577; Stevens v. United States, supra n. 12; cf. Sica v. United States, 9 Cir., 1964, 325 F.2d 831–836. But see Jones v. United States, 1967, 128 U.S.App.D.C. 36, 37, 40, 385 F.2d 296, 297–300.

16. Stevens v. United States, supra n. 12. Indeed, in a particular case, far from being "plain," the error may be "harmless," under Rule 52(a), F.R.Crim.P. Cf. Bushaw v. United States, 9 Cir., 1965, 353 F.2d 477, 481.

statement that related to Booker's testimony, or to such matters as his bias, corruption, etc.,[17] we would find no error.

■ The prosecutor did much more; he called Turnbou to identify the statement and describe the circumstances of its execution, and then offered it in evidence. Defense counsel's objection was on two grounds. The first was that the writing was not that of the defendant. This may have been an attempt to state a claim of hearsay, but if so it was inadequately articulated.[18] The other objection, that the statement was not voluntary, is directly contrary to the record.[19] Thus the objection was insufficient.

■ But here the statement contained much more than Booker's description of the offense for which Benson was being tried. We can think of few statements that would be more prejudicial to one on trial in a narcotics case than those appearing on the second (top) page, from which we have quoted. It would have been highly improper for the prosecutor to ask Booker about them, and he did not do so. It was equally improper for him to get them in the back door by offering the statement in evidence, objection or no objection. We are constrained to hold that the admission of the statement was plain error within the meaning of Rule 52(b), F.R. Crim.P.[20] Benson is entitled to a new trial.

Reversed and remanded for a new trial.

---

17. III Wigmore, supra n. 12, §§ 1020–1022; Gung You v. Nagle, 9 Cir., 1929, 34 F.2d 848, 852.

18. Even if the objection had been on hearsay grounds, it would not have been good. Stevens v. United States, supra n. 12.

19. Booker testified: "Q. All right. Were any threats or anything like that used against you to make you sign this piece of paper?

A. No, sir."

Turnbou testified: "Q. And would you state whether or not any threats or promises or coersions [sic] of any kind were exercised against Mr. Booker in order to obtain his signature?

A. No, they were not."

20. Cf. Bowie v. United States, 9 Cir., 1965, 345 F.2d 605, 609–610; Upham v. United States, 5 Cir., 1964, 328 F.2d 661.