**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Philip A. McLENNAN and Fred H. Bender, Defendants-Appellants.**

No. 76–2365.

United States Court of Appeals, Ninth Circuit.

Oct. 19, 1977.

Rehearing and Rehearing En Banc Denied Dec. 2, 1977.

Leslie M. Roberts, Norman Sepenuk, Portland, Or., argued for defendants-appellants.

Marc Blackman, U. S. Atty., Portland, Or., argued for plaintiff-appellee.

Before DUNIWAY, ELY and CHOY, Circuit Judges.

DUNIWAY, Circuit Judge:

Defendants McLennan and Bender appeal from judgments convicting them of (1) making false statements in a matter within the jurisdiction of a department or agency of the United States, (2) making false statements for the purpose of influencing the action of the Department of Housing and Urban Development (HUD), and (3) conspiring to make such false statements and to defraud the United States, all in violation of 18 U.S.C. §§ 371, 1001, and 1010 (1970). We affirm.

## FACTS

During the years 1971 through 1975, defendants, through two non-profit corporations, applied for loans from HUD under the College Housing Act of 1950, 12 U.S.C. §§ 1749 *et seq.* (1970), for the purpose of designing and constructing seven college dormitory facilities in four states. The Act provided for loans covering "project costs" incurred by a borrower and concurred in by HUD and prohibited profit-making by a borrower. Architectural costs were limited to those actually "necessary" for the construction of the particular project being funded.

From October, 1971, to April, 1975, the defendants received a total of $961,282 from HUD, which they repeatedly represented in loan applications, through owner-architect agreements, in fund requisitions and in final project costs decertifications, as being paid or payable to the project architect, Charles Dahlen. In reality, Dahlen was not an independent contractor as HUD was led to believe, but rather a salaried employee of the defendants. After paying Dahlen's salary and expenses, the defendants divided the remainder of the money received from HUD for architect's fees, roughly $600,000, between them. These criminal charges resulted from their false statements that this money was to pay or was paid to the architect. Defendants' primary defense was that they acted in good faith, thus lacking the specific intent required to violate the applicable statutes. As part of that theory, they claimed that at all times they had acted on the advice of their counsel and accountants.

On this appeal, the defendants raise two issues:[1] (1) whether certain testimony was inadmissible hearsay and irrelevant; and (2) whether the district court erred in its instruction to the jury concerning the dismissal of part of the indictment.

## I. *The Alleged Hearsay Statement.*

Defendants challenge the admission of certain testimony of their former attorney on the grounds that it was (1) inadmissible hearsay, and (2) irrelevant.[2]

The defendants' former attorney, Burnett, testified about the advice which he

---

1. Three issues were originally raised in this appeal. However, at oral argument on January 12, 1977, the defendants' attorney "waived for all purposes" the issue challenging the instruction given on "motive" and "intent." Therefore, we will only deal with the two remaining issues.

2. Defendants waived the attorney-client privilege to allow their former attorney to testify.

had given them. The statement made by Burnett, which is now being challenged, was elicited in the following exchange on direct examination by the government.

Q. Now, were you aware, in 1971, that funds were being paid from an account in the name of Charles Dahlen to Mr. Bender and Mr. McLennan?

A. No.

Q. Were you aware of that in 1972?

A. No.

Q. Did you become aware of that in 1973?

A. In late 1973, yes.

    \*    \*    \*    \*    \*    \*

Q. When you did learn from Mr. Bender about these transfers, do you specifically recall what it was that you said to him?

A. Yes.

Q. And what was it?

A. "For Christ's sake, I told you that was illegal." (Reporter's Transcript 407, 409)

■ Defendants claimed that their good faith reliance upon the advice of counsel negated the fraudulent intent that was an essential element of the charge. Advice of counsel is no defense unless the defendant gave his attorney all of the facts, and unless counsel specifically advised the course of conduct taken by the defendant. *Bisno v. United States*, 9 Cir., 1961, 299 F.2d 711, 719–20, *cert. denied*, 1962, 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818.

■ Under these rules, the questions and answers about Burnett's awareness of the facts in 1971, 1972, and 1973 were clearly relevant. Moreover, because Burnett was speaking of what he knew, and when, his answers were not hearsay. Defendants do not disagree.

■ They concentrate their fire on the last answer quoted above. It was clearly relevant and damaging to their defense of good faith reliance upon their attorney's advice. The issue is whether it was admissible. Judge Skopil in his order denying the

defendants' motion for a new trial concluded that the statement was not hearsay because it was offered to prove something other than the truth of what was said, Fed.R.Evid. 801(c), and therefore was admissible. He was right.

In late 1973, defendants' auditors raised questions about what defendants had done and were doing with the moneys that, according to defendants' certifications to HUD, were to go to the architect. One of the defendants thereupon called in Burnett, and the incident that is quoted resulted. At that time, moneys were still to be received from HUD, and thereafter the defendants again certified to HUD that a named percentage of the moneys claimed were to go to the architect. Two of the counts in the indictment, Counts VII and VIII, relate to those false certifications.

The exclamation was not a mere assertion by the attorney that he had told the defendants something in the past. In the circumstances in which it was made, the attorney having been called in for advice, and one of the defendants having just told him what they were really doing, the statement would clearly tell the defendants: "I'm telling you now that is illegal," or so a jury could find. The reference to the previous advice, and the attorney's obvious surprise and dismay strongly reinforce his opinion, making his statement even stronger than if he had merely said, "That is illegal." The statement was relevant as present notice; it was not merely an assertion of past notice to the defendants.

■ Moreover, the statement was not offered or admitted to prove the truth of what Burnett said—that defendants' actions were illegal or that in the past he had told them "That is illegal"—but simply to show that the statement concerning illegality had been made. When the defense is advice of counsel, the advice given, whether correct or not, and whether recitals in it are true or not, is always admissible. Usually the defense of advice of counsel is raised where the conduct involved is illegal. Thus, almost by definition the advice relied upon will have been erroneous but given and

relied upon in good faith. The words spoken are the advice given. Advice is customarily given in words, and when advice is the question, the words which constitute the advice are classic examples of verbal acts, admissible because they were spoken, whether true or false. Such verbal acts are not hearsay. They come in to bring home notice to the defendant in a case like this. *United States v. Kutas*, 9 Cir., 1976, 542 F.2d 527, 528. *See also Phillips v. United States*, 9 Cir., 1965, 356 F.2d 297, 301, *cert. denied*, sub nom. *Walker v. United States*, 1966, 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548. Thus, if the attorney had added: "I told them that I had discussed this with several attorneys expert in these matters, and that they all agreed with me that that is illegal," that too would be admissible, whether or not the witness' statement of what he had done and what he had been told was true. It would still be a statement by the attorney of the advice he had given.

*United States v. Freeman*, 9 Cir., 1975, 519 F.2d 67, also supports this conclusion. In that case, Freeman was appealing her conviction for "bail jumping" which was based upon her failure to appear in district court on a specific date. A major issue in the district court was whether she knew that she had been ordered to appear on that date. Her attorney was asked, under oath, whether he had previously stated to the court that he had told his client when she was scheduled to appear. We said:

> Counsel was not asked whether he had advised appellant of the order that she appear on May 20th; instead, he was asked whether, on that date, he had stated to the court that he had done so. An affirmative response to the former question, insofar as it constituted evidence of utterances and writings offered to show the effect on the hearer or reader, would not have been subject to attack as hearsay. *See, e. g.*, McCormick, Evidence § 249 (2d ed. 1972), 519 F.2d at 69..

In *Freeman*, the statement was not elicited to show its effect upon the court but rather to show that Freeman knew the date of the court appearance. The statement was relevant only if it showed that the attorney did tell Freeman, his client, when to appear. At issue was the very truth of the matter asserted. Here, the statement was offered to show its effect upon the defendants. Here, it is the fact that the statement was made, not its truth, that is relevant and material. That is precisely the distinction recognized by the court in *Freeman, supra*. Our case is like the case that would have been before the court in *Freeman* if in that case "[c]ounsel was . . . asked whether he had advised appellant of the order that she appear on May 20th . . . .. An affirmative response to [that] question . . . would not have been subject to attack as hearsay."

Moreover, the fact that the statement was made was also compelling evidence that before November, 1973, Burnett was not aware that the defendants had been personally appropriating the architect's fees. It shows the attorney's lack of knowledge about the defendants' activities. From this the jury could conclude that the defendants had not fully informed their lawyer of all the material facts when they were soliciting his advice, thus undermining their defense of reliance on the advice of counsel. *Williamson v. United States*, 1908, 207 U.S. 425, 453, 28 S.Ct. 163, 52 L.Ed. 278; *Bisno, supra*, at 720. Because Burnett's testimony was offered to show both defendants' and Burnett's knowledge, it was not hearsay, and its admission was proper.[3]

■ The defendants also argue that even if the statement was admissible to show intent, the court should have instructed the jury that it was not to be considered for the truth of the matter stated. Defense coun-

---

**3.** Burnett had advised McLennan and Bender how to avoid violating the Copeland Act (a charge which was dismissed from the case, *see, infra*, Part II). His testimony, and in particular, the statement being challenged here, was referring to his advice regarding that Act. Because the evidence was not being admitted to prove that McLennan and Bender were, indeed, violating the Copeland Act, but merely to show what advice their attorney had given them, the dismissal of the Copeland Act charge did not affect the admissibility of that statement.

sel, although objecting to the answer and moving for a new trial, never asked that the court give such a limiting instruction. Fed.R.Evid. 105. He argues now that such a request would have been "futile" because the trial court had ruled that the statement was not hearsay. We fail to see the "futility" of such a motion. The court had said nothing about a limiting instruction because he had not been asked to give one. Nothing prevented counsel from making such a request. In the usual case, the court is not required to give such an instruction *sua sponte*. *Benson v. United States*, 9 Cir., 1968, 402 F.2d 576, 581. The law places upon counsel the duty to ask for it. *Sica v. United States*, 9 Cir., 1963, 325 F.2d 831, 836, *cert. denied*, 1964, 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 972. *See United States v. Campbell*, 9 Cir., 1972, 466 F.2d 529, 531, *cert. denied*, 1972, 409 U.S. 1062, 93 S.Ct. 571, 34 L.Ed.2d 516; *Petley v. United States*, 9 Cir., 1970, 427 F.2d 1101, 1106, *cert. denied*, 1970, 400 U.S. 827, 91 S.Ct. 55, 27 L.Ed. 57.

■ In this case, Burnett was subject to cross-examination and, indeed, at the end of his testimony specifically asked for and received permission to explain the context in which the statement was made. (Reporter's Transcript at 430–432.) While a limiting instruction could have been given if requested, we cannot find that its omission was plain error. F.R.Crim.P. 52(b).

■ Finally, the trial judge had broad discretion to determine relevance. *United States v. Salazar-Gaeta*, 9 Cir., 1971, 447 F.2d 468. There was no abuse of that discretion in this case. The statement was clearly relevant.

■ It is suggested that the witness' answer could be admitted as an excited utterance. This seems doubtful on the record before us. According to McCormick,

there are two conditions precedent to the admission of a hearsay statement under the "excited utterance" exception: "First, there must be some occurrence or event sufficiently startling to render normal reflective thought processes inoperative. Second, the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought." *McCormick on Evidence* § 297, 2d Ed. p. 704. Thus, when a hearsay statement is offered under this exception, the trial court must make a preliminary factual determination that the declarant was so excited or distraught at the moment of utterance that he did not reflect (or have an opportunity to reflect) on what he was saying. Judge Skopil made no such determination here. The record is hardly sufficient for us to do so. Moreover, as McCormick notes, "Most courts . . . would probably be extremely skeptical regarding whether one merely informed of an event could become so excited upon hearing of it as to lose the power of reflective thought." *Id.* at p. 705.

It is also suggested that *Freeman* was wrongly decided, because self-quoting by a witness is not hearsay. But this panel cannot overrule *Freeman*. Only the court *in banc* can do that. This case is not a good vehicle for that purpose. *Freeman* itself recognizes a distinction under which, as has been shown, the testimony here in question was admissible.

## II. *Alleged Error in Jury Instructions.*

■ Count I of the indictment originally contained a portion alleging a violation of the Copeland Act, 18 U.S.C. § 874 (1970).[4] The indictment did not mention the Copeland Act by name. It merely cited § 874. The defense moved to dismiss that part on the ground that the Copeland Act did not apply to the facts alleged by the govern-

4. 18 U.S.C. § 874 (1970) states:

Kickbacks from public works employees

"Whoever, by force, intimidation, or threat of procuring dismissal from employment, or by any other manner whatsoever induces any person employed in the construction, prosecution, completion or repair of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, to give up any part of the compensation to which he is entitled under his contract of employment, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

ment. Initially, the trial judge denied the motion and thus, during the presentation of the government's case, there were some references by witnesses and counsel to the Copeland Act. In addition, the indictment which was read to the jury at the beginning of the trial also contained the Copeland Act charge, although the name of the Act was not mentioned.[5] At the close of the government's case, defense counsel again moved to dismiss that portion of the case, and at that time, the motion was granted, and the trial judge dismissed that portion of the conspiracy count (Count I ¶ 2. c.) which contained the Copeland Act charge.

At defense counsel's request, the judge stated that he would inform the jury about the dismissal of that part of the indictment, and he warned defense counsel that the dismissal was not to be used as a weapon in closing argument. Immediately before final arguments, the court instructed the jury that it had "taken a portion of Count I away from the jury's consideration . . purely as a matter of law, and [it] has nothing to do with the factual determination which you are to make on the other counts" (Reporter's Transcript at 937–938). No mention was made by the court that the dismissed portion of the indictment concerned the Copeland Act, or that it referred to "kickbacks."

McLennan and Bender contend that the court's explanation of the dismissal of those charges was inadequate because it did not inform the jury of the substance of the deleted charge to help the jury sift out the irrelevant evidence. The argument is a red herring. The fact is that all of the evidence which was admitted was relevant under the charges that remained in the case. There was no evidence that was relevant only to the Copeland Act charge. Indeed, defense counsel at oral argument was unable to

point to any evidence presented which was relevant solely to the Copeland Act allegation. Thus the type of instructions to the jury that defendants now mention were unnecessary. Defendants do not claim either (a) that the court gave *any* instructions that would be appropriate only to the Copeland Act, thus permitting the jury to convict under that Act, or (b) that *any* of the instructions that the court did give, relating to the charges that remained before the jury, were erroneous. How, then, could the defendants be prejudiced?

Defense counsel argues that the problem was not irrelevant evidence but rather that references to the "Copeland Act" implied to the jury that an ongoing relationship of this type between the developers and the architect was *per se* illegal. The thrust of this argument takes us back to Burnett's statement discussed in the first part of this opinion. Defense counsel is contending that the jury considered the statement as true and as an indication that the defendants' actions were illegal under the Copeland Act. He also argues that the court failed to explain to the jury that (1) the Copeland Act was no longer a part of the case and (2) because the trial court had determined that the Act did not apply to this type of relationship, the defendants' activities did not violate it. That omitted explanation, counsel argues, left the unwarranted and prejudicial implication of illegality before the jury. This, too, is a red herring.

The prosecutor's opening argument covers 50 pages of the transcript. Never once did he argue the substantive offense proscribed by the Copeland Act. Never once did he argue that what defendants did violated the Copeland Act. His entire argument was directed to the remaining charges—false statements to the govern-

---

**5.** The part of the original indictment which referred to the provisions of the Copeland Act stated:

"c. The defendants, by deception and by other means and in other manners, did induce Charles R. Dahlen, a person employed in the construction, prosecution, completion or repair of building or work financed in whole or in part

by loans or grants from the United States, namely student housing construction under the College Housing Act of 1950, to give up part of the compensation to which he was entitled under his contract of employment as set forth in Owner-Architect Agreements; in violation of Title 18, United States Code, Section 874." (Clerk's Transcript at 3–4)

ment that enabled the defendants to get from the government over $600,000 to which they were not entitled. The Copeland Act deals with "kickbacks" and would apply only if the defendants had required the architect to pay to them money that he had received from the government. The prosecutor never argued that that is what happened. The court gave no instructions on that subject.

In opening his argument, the prosecutor mentioned the Copeland Act only once, in reference to attorney Burnett's testimony that he told the defendants that an arrangement whereby the architect would be on salary, doing the work for less money than they told the government it cost, couldn't work and would be illegal because of the Copeland Act. *Defense counsel did not object then or at any time.* The argument was legitimate because Burnett did mention the Copeland Act, and the defendants went ahead in spite of his advice. But the prosecutor did not suggest that defendants could be convicted under the Copeland Act.

In his closing argument, defense counsel mentioned the Copeland Act twice. Once, he referred to a contract that was in evidence, and here is what he said:

> Well, ladies and gentlemen, I would, of course, suggest to you that you do read it and I would like to put this agreement in context, too. This agreement was drawn by Mr. Burnett. It was drawn, in part, to avoid Copeland Act problems and, incidentally, ladies and gentlemen, the Copeland Act is no longer part of the case. That is one of the charges that are no longer before you. It is not a part of this case, but it was drawn in part to avoid the so-called Copeland Act problem, anti-kickback problem, so to speak. [R.T. 998]

The second time what he said, referring to Burnett's testimony, was this:

> I said to him:
>
> *      *      *      *      *      *
>
> Q. Now, in setting up these entities, I take it you were concerned with making sure that the defendants didn't do anything improper?

> A. Certainly.
>
> Q. Or run afoul of the law?
>
> A. Certainly.
>
> Q. Especially the so-called Copeland Act?
>
> A. Well, among all the others, sure. And as I mentioned, that Copeland Act is not part of this case. And there was a problem with the Copeland Act and he was trying to implement the total developmental entity approach just for this dream of Mr. McLennan's. [R.T. 1046–47]

Thereafter, the Copeland Act was not mentioned again by anyone, including the prosecutor in his closing argument.

As the case was finally submitted to the jury, it was based entirely upon these contentions: The defendants employed an architect, Dahlen, upon a monthly salary plus expenses, which together totalled approximately $300,000. However, on various documents submitted to HUD, they repeatedly represented that the architect was entitled to either a percentage of cost or named sums of money totalling approximately $900,000. They covered up the fraud by setting up a "revenue" account in Dahlen's name, on which they could draw but on which he had no right to draw, and into which they put the moneys that they had received for architect's costs. From this account, they paid to the architect his $300,000, and they paid to themselves $600,000. It was a sophisticated and highly successful fraud. And they concealed it from their attorney as well as from the government. The case was proved to the hilt. It was not a close case.

It is not correct to say that most of the government's evidence related to the Copeland Act charge. It is not correct to say that that Act provided the strongest single ground for the charge that defendants' arrangement with the architect was illegal, and that concealing it was false or misleading. It is not correct to say that Burnett's dismayed statement was the strongest evidence of illegality and of defendants' knowledge. In fact, the Copeland Act

charge was a minor part of the case. The Act is referred to only in the conspiracy count, Count I, and then only in the portion quoted in footnote 5, *supra*, a subparagraph of 7 lines in a count of 14 pages that stated in detail just what the defendants had done. None of the remaining counts refers to the Copeland Act. Counts II through V refer to 18 U.S.C. § 1010—false statements to HUD. Counts VII and VIII refer to 18 U.S.C. § 1001, the general false statement section.

It is apparent that the Copeland Act language in the indictment was a protective charge, one intended to forestall a defense that the deposit of money in the Dahlen revenue account was in fact a payment to Dahlen, who could then do with it as he pleased, so that payments to defendants from that account were by Dahlen to them, instead of a cover-up for their simply keeping the money. The evidence, however, is that Dahlen never got the money in the first place, although the defendants represented to the government that he was to get it. That is the gist of the charge; that is the theme of the indictment; that was the theme of the prosecutor's argument; that is what this case is really about.

The court was never asked by the defense to instruct the jury "comprehensively" or "in detail" about the dismissal of the Copeland Act reference in Count I. Defense counsel never suggested any particular or specific language on the subject. Before the case was argued to the jury, the court instructed them as follows:

There is one matter that I do desire to take up with you prior to the time that they start their argument, and as a matter of law, the Court has taken certain portions of the indictment away from the jury's consideration and those matters will not be considered by you.

As you recall, this was an eight-count indictment. It was read to you at the start. Mrs. Hui read it to you. I, as a matter of law, have taken Count VIII away from the jury's consideration and also have taken a portion of Count I away from the jury's consideration. That

is a matter of law that the Court had to determine. It's no concern to you, as far as the facts are concerned, with reference to the remaining counts.

So I wanted to advise you of that in view of the fact that those matters are not now before the jury, you might have wondered why the attorneys were not talking about those matters, but they have been taken away from you, purely as a matter of law, and has nothing to do with the factual determination which you are to make on the other counts. [R.T. 937–38]

*Defense counsel did not object.*

When the prosecutor's opening argument is considered in its entirety, the one reference to the Copeland Act was properly used to support the general theory that the defendants did not, in good faith, follow their attorney's advice, and it was a minor part of the argument. As I have already indicated, the statement was admissible for that purpose, and the burden of asking for a limiting instruction which would have alleviated this "problem," of which counsel now makes so much, rested with the defense.

Even assuming that the jury might have drawn an improper conclusion from the reference to the Copeland Act, the problem was eliminated by the trial court's instructions. Judge Skopil told the jury only what it must find to convict under the charges remaining in the indictment. At no point was the jury told what findings would justify a conviction under the Copeland Act. All that the jurors knew about the applicable law was what the trial judge clearly and correctly explained to them. To those instructions *there was no objection.* In addition, a copy of the indictment, with *all* references to the dismissed charges deleted was given to the jury. *There was no objection.* There was no possible prejudice.

Under the circumstances, it is unnecessary to consider whether the charge under the Copeland Act was improperly dismissed.

Affirmed.

**952**

CHOY, Circuit Judge, concurring specially:

I agree that the convictions of McLennan and Bender should be affirmed. I would reach that result, however, for reasons different from those advanced by Judge Duniway.

*Hearsay*

I am unpersuaded by Brother Duniway's attempt to distinguish the controlling precedent of *United States v. Freeman*, 519 F.2d 67 (9th Cir. 1975). Here, as there, the involved statements contained the words "I told" (or "stated" or "advised"), and thus at least that portion of the declarant-witness's out-of-court utterance cannot be said to have been offered merely for the nonhearsay purpose of proving notice, for previous notice in this context is *the very truth of the matter asserted* : that this statement was in fact previously uttered.[1] On the assumption that *Freeman* was correctly decided, therefore, Burnett's testimony in the instant case was hearsay. Even as such, however, I would hold that it is admissible under the excited utterance exception, Fed. R.Evid. 803(2). *See United States v. Bell*, 351 F.2d 868, 872–73 (6th Cir. 1965), *cert. denied*, 383 U.S. 947, 86 S.Ct. 1200, 16 L.Ed.2d 210 (1966) (decided prior to the effective date of the Federal Rules of Evidence).

More fundamentally, however, upon reflection I now question the validity of the holding in *Freeman* that a declarant-witness's self-quoting is in fact hearsay.[2] Although commentators maintain that, as a general principle, under the "orthodox approach," such self-quotation is technically hearsay if offered for the truth of its contents, *see* 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(1)[01], at 801–64 to –65 (1975) [hereinafter cited as Weinstein] and authorities cited therein, I have found no case other than *Freeman* which so holds, and *Freeman* itself cited none. The reason for this precedential void may be that characterization of declarant-witness self-quoting as hearsay—and its resultant exclusion on that basis—usually may be avoided by offering the statement not to prove the truth of the matter asserted therein, but rather to prove notice or knowledge on the part of someone alleged to have heard (or read) the statement. Because of the "I told" component of the statements in *Freeman*, however, such treatment was unavailable, and the evidence there was held to be hearsay.[3] I

---

1. Judge Duniway's misreading of *Freeman* may stem from the focus of his attention in that opinion. He quotes the following language:

   > Counsel was not asked whether he had advised appellant of the order that she appear on May 20th; instead, he was asked whether, on that date, he had stated to the court that he had done so. An affirmative response to the former question, insofar as it constituted evidence of utterances and writings offered to show the effect on the hearer or reader, would not have been subject to attack as hearsay. *See, e. g.*, McCormick, Evidence § 249 (2d ed. 1972).

   519 F.2d at 69. He overlooks, however, the very next sentence:

   > But an affirmative response to the latter inquiry—the response here given—was clearly evidence of out-of-court statements offered to prove the truth of the matters asserted therein.

   *Id.* (footnote omitted).

   It is possible that the result in *Freeman* may reflect a desire to limit evidence of a witness's effort to buttress his statement with testimony that he had repeated it before. If so, whether

Ms. Freeman's attorney stated what he did to the court in the bail-jumping proceeding may well have been irrelevant, and possibly should have been excluded on that basis. But that objection is clearly not one based on hearsay principles. The hearsay problem would arise only when, and if, third parties to whom the declarant had spoken were called to corroborate his testimony.

2. The *Freeman* court went even further in that it apparently found some statements to have been hearsay by adoption, for the witness's testimony in one instance consisted only of the answer "yes" to the prosecutor's question.

3. Judge Duniway characterizes Burnett's self-quote as a classic example of a verbal act, which is not, in turn, hearsay, citing *United States v. Kutas*, 542 F.2d 527, 528 (9th Cir. 1976), and *Phillips v. United States*, 356 F.2d 297, 301 (9th Cir. 1965), *cert. denied sub nom. Walker v. United States*, 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966). I have difficulty with this analysis. The hearsay issues in the cited cases are resolved not by the verbal act exception, but by the well-accepted notice or

believe that, if the holding in *Freeman* was correct on this issue, it compels the same result here.

I would reject the assumption in *Freeman* and do away with its rule that makes declarant-witness self-quoting hearsay (1) because it is so rarely encountered (possibly only in the context of "I told" or equivalent statements), (2) because the problem is so easily avoidable by a properly framed question which elicits identical information, and (3) because, in any event, the rule is without foundation either in logic [4] or the policy considerations which underlie the hearsay

safeguards, for the declarant-witness is present at trial, under oath, subject to cross-examination, and he affirms the statement as his.[5] *See generally* McCormick on Evidence § 245 (2d ed. Cleary 1972). I would hold that, in all cases, declarant-witness self-quoting is not hearsay, or that, if it is technically hearsay under the definition of Fed.R.Evid. 801(c), it should be admitted pursuant to the "federal common law" hearsay exception provisions of rule 803(24) owing to its independent indicia of reliability and to serve the "interests of justice." [6] *See* 4 Weinstein at 803–250.

knowledge exception to the hearsay rule. *See Kutas*, 542 F.2d at 528 ("[t]he statement was admitted as evidence from which it could be inferred that [defendant] knew"); *Phillips*, 356 F.2d at 301 ("[t]he documents in question were received . . . for the jury's consideration in determining whether one or more of the defendants knew"). While application of the verbal act concept is less than uniform, *see generally* 4 Weinstein at 801–59 to –60, it is at least questionable whether the cited authorities render it apposite here. Moreover, resort to verbal act analysis obscures the fact that notice is clearly at issue here, and that the notice exception is unavailable where the truth of the "I told" component of the statement is the truth of the matter asserted.

4. An absurd result obtains: a witness can, without any possible hearsay objection, relate what he has seen, yet he cannot relate what his memory tells him his own mouth said. It is as if one's eyes' sensory input to the brain is admissible, but testimony as to one's mouth's sensory input to the brain is forbidden.

5. Such is apparently also the understanding of the federal Advisory Committee on Proposed Rules as expressed in a somewhat ambiguous commentary to rule 801, which became effective after the trial in *Freeman*:

Considerable controversy has attended the question whether a prior out-of-court statement by a person now available for cross-examination concerning it, under oath and in the presence of the trier of fact, should be classed as hearsay. *If the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem.* The hearsay problem arises when the witness on the stand denies having made the statement or admits having made it but denies its truth. Fed.R.Evid. 801(d)(1), Note (prior statement by witness) (emphasis added). Later in the same Note, however, the Committee cuts back on the expansive thrust of the foregoing language, and it seems to limit the admission of a witness's

prior statements as substantive evidence to the two contexts of present rule 801(d)(1)(A) and (B)—prior inconsistent statements given under oath, and prior consistent statements offered to rebut a charge of recent fabrication or improper motive—and not to differentiate between whether a third party is testifying as to what the then-present declarant had said or whether the declarant himself is testifying as to what he said.

The Note and commentators suggest that the reluctance to permit the admission of prior out-of-court statements of a witness notwithstanding his present availability for cross-examination under oath grew from a fear that such a rule would lead to trial by fraudulently prepared deposition testimony. *See, e. g.*, 4 Weinstein at 801–68 to –69. Such an apprehension, however, goes more to condemning the ethics of the federal bar than to violations of the policies underlying the hearsay protections. *Compare* note 1 *supra*.

6. Rule 803(24) provides that the following is not excluded as hearsay:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

**954**

### The Copeland Act Count

I also cannot agree with Judge Duniway's conclusion that the failure of the trial court to instruct the jury in detail about the dismissal of the Copeland Act count was not error. Clearly, most of the evidence offered by the Government related to this count. The Copeland Act provided the single strongest ground upon which the Government based its contentions that defendants' architect-developer arrangement was illegal and that the failure to disclose it was "false" or "misleading." Moreover, as placed before the jury, the "that's illegal" portion of Burnett's testimony was the prime piece of evidence of both the illegality of defendants' conduct as well as their knowledge thereof.[7]

But, once again, I concur in the result, for I believe that a properly instructed jury could find that defendants' architect-developer agreement did involve a "kickback" in violation of the Copeland Act and that the trial court, therefore, was in error in dismissing the Copeland Act count. The double jeopardy clause and 18 U.S.C. § 3731 (appeal by United States) may well forbid the Government from appealing the dismissal of the count for purposes of reinstating the indictment as to it. *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977); *United States v. Morrison*, 429 U.S. 1, 97 S.Ct. 1292, 50 L.Ed.2d 1 (1976); *United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975); *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). We are free, however, to examine the propriety of the dismissal to determine whether, instead of being prejudiced by an alleged improper omission from the jury charge, the defendants in fact received more generous treatment than they deserved by virtue of the dismissal and,

therefore, now have no cause to complain that an improper dismissal was not clearly explained. *Cf. United States v. Lemon*, 550 F.2d 467, 469–70 (9th Cir. 1977); *United States v. King*, 552 F.2d 833, 849 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

While it may be true, as the district court apparently held, that the legislative history of the Copeland Act reveals that it was passed in order to prevent contractors from avoiding those minimum wage laws which govern federal construction, *see United States v. Carbone*, 327 U.S. 633, 638–39, 66 S.Ct. 734, 90 L.Ed. 904 (1946) (discussing in detail the Copeland Act's legislative history), the words of the statute are clear in their generality:

> Whoever, by force, intimidation, or threat of procuring dismissal from employment, or by any other manner whatsoever induces any person employed in the construction, prosecution, completion or repair of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, to give up any part of the compensation to which he is entitled under his contract of employment, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 874. We must observe the admonition of the Supreme Court—repeated recently in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977), *quoting Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J. concurring)—that " '[t]he starting point in every case involving construction of a statute is the language itself.' " On the face of the Copeland Act, there is no indication that Congress intended to limit its reach to the minimum wage context.

---

7. If the Copeland Act does not apply, I would hold that the failure of the court below to limit the admission of Burnett's testimony to proof of notice of possible illegality—which failure allowed it to appear that defendant's own counsel on the involved projects was testifying that defendants' conduct was "illegal"—was plain error under Federal Rule of Civil Procedure 52(b). If the Act does apply, however, it would provide a sufficiently strong basis for calling the arrangement illegal, and the failure to give a limiting instruction, though still error, would not be so egregious that we should recognize it without a proper contemporaneous objection.

Nor is there an ambiguity which would compel a resort to the legislative history. See *Ex parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949); *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 492, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *United States v. Sabatino*, 485 F.2d 540, 544 (2d Cir. 1973), *cert. denied*, 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974).[8] I would, therefore, heed the sardonically expressed teaching of Mr. Justice Frankfurter that

> this is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute[,]

*Greenwood v. United States*, 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956), *quoted in Van Hoomissen v. Xerox Corp.*, 503 F.2d 1131, 1133 (9th Cir. 1974), and hold that the Copeland Act count was improperly dismissed.

On these grounds, I would Affirm.

ELY, Circuit Judge (Dissenting):

I respectfully dissent. The results reached by my Brothers in their respective opinions are not acceptable to me.

## HEARSAY

Like Judge Choy, I agree that *Freeman*, however ill-considered, is controlling here. I do not agree, however, that Burnett's statement was, in any event, admissible under the "excited utterance" exception to the hearsay rule. Fed.R.Evid. 803(2). In my

judgment, the record does not lead to the firm belief that Burnett spoke "under the immediate and uncontrollable domination of the senses . . .." 6 *Wigmore, Evidence* § 1747 at 195 (Chadbourn rev. 1976). Accordingly, I would reverse under the compulsion of *Freeman*.

## COPELAND ACT

Again, like Judge Choy, I cannot agree with our Brother Duniway's conclusion that the District Court's failure to instruct the jury comprehensively in respect to the dismissal of the Copeland Act (Act) count of the indictment resulted in no more than harmless error. Unlike my Brother Choy, however, I cannot conscientiously agree to affirm, even assuming *arguendo*, that the District Court erred in dismissing the Copeland Act count of the indictment.[1] This is especially so because of the prosecutor's references during his closing argument to the Copeland Act (R.T. 970–71), to Burnett's statement in respect to the illegality *under the Act* of the developer-architect relationship (R.T. 970–71, 973–74, 1063–64), and to illegal kickbacks (R.T. 987–88). Thus, I submit that my Brother Duniway's statement that "only one" possibly prejudicial remark was made by the prosecutor is inaccurate, as well as quite lame. Even if we assume that only one unfair blow was struck, it was a fatal blow.

As Judge Choy emphasizes, the "that's illegal" portion of Burnett's testimony was the single most damaging part of the evidence concerning the illegality of the appellants' conduct and, of course, their alleged

---

8. I am cognizant that, in the criminal context, ambiguity with respect to a statute's ambit should be resolved in favor of lenity. *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). I, however, find no ambiguity in the Copeland Act. *Compare Sabatino*, 485 F.2d at 544.

1. Judge Choy insinuates that the offense charged under the Copeland Act was erroneously dismissed and that, hence, the appellants are in no position to complain about those remarks of the prosecutor that were pertinent only to that Act. As I see it, this approach is not only illogical, but also it is contrary to the most basic traditional concept of an orderly

trial. Even if a trial judge issues erroneous rulings, ethical trial counsel are obliged to abide by those rulings. The approach taken by my Brother Choy, if adopted, could lead to intolerable consequences. It would encourage an attorney, believing that the trial court had erred (e. g., in dismissing a charge based upon a specific statute, as here), to defy the judge by uttering forbidden comments in the hope that an appellate court would hold that the trial court's basic ruling was erroneous and, for that reason, forgive, or hold harmless, the attorney for conduct that would otherwise be prejudicial to the accused and contemptuous of the court.

knowledge thereof. The district judge, acting properly within his discretion, had sternly admonished defense counsel not to utilize the dismissal of the Copeland Act count as a "sword" during closing argument. As the proceedings developed, however, this was a "sword" that defense counsel sorely needed to defend his clients against the prosecutor's continued offensive use of Burnett's exclamation that the developer-architect relationship violated the Act. Whether or not the prosecutor intended only to impress the jury with the thought that the appellants had not followed the advice of their attorney, the pivotal consideration is that the jury had no way of knowing whether the Act mentioned by the prosecutor was the basis of the count that had been dismissed. To me, it is logical to infer that the prosecutor's reference to the Act during closing argument, *after* the trial judge had mentioned that certain aspects of the indictment had been dismissed, would lead the jury to believe that the Copeland Act count of the indictment remained in force. I find nothing in the eventual instructions to the jury to dispel such a notion. Moreover, I do not consider defense counsel's two references to the Act (R.T. 998, 1046-47) to be an adequate substitute for proper jury instructions. The remarks of an advocate do not bind the jury, but the court's instructions do, strictly and literally. It is entirely conceivable, therefore, that the conviction eventually rested upon an offense no longer charged.

I cannot say that the prosecutor spoke with malice, either when he referred to the Act, or when he repeatedly emphasized Burnett's expletive. On the other hand, I have found no precedent allowing a prosecutor to comment, during his summation, on a previously dismissed count of an indictment. To permit his doing so, particularly when defense counsel has been so sternly warned not to refer to it, seems to me to be thoroughly wrong. The prosecutor's improper comment on the Act, fortified and emphasized by subsequent references to Burnett's inadmissable damaging statement and to the kickbacks, grievously prejudiced the defendants and, in my opinion, could not possibly have been cured by any instruction to the jury. The appellants, in fairness, should be tried anew.

I would reverse.